Filed 12/3/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEStarPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S120583 |
| v. | ) | |
| | ) | |
| MICKY RAY CAGE, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. RIF 083394 |
| _____ | ) | |

A jury convicted defendant Micky Ray Cage of the 1998 first degree murders of Brunilda Montanez and David Burgos (Pen. Code, § 187),[1] and of being a felon in possession of a firearm (former § 12021, subd. (a)(1)). The jury found true the allegation that as to each murder defendant personally and intentionally discharged a firearm and proximately caused great bodily injury or death to another person within the meaning of section 12022.53, subdivision (d) and section 1192.7, subdivision (c)(8). It also found true the alleged special circumstances of lying in wait (§ 190.2, subd. (a)(15)) and multiple murder (§ 190.2, subd. (a)(3)). The jury returned a penalty verdict of death for the two murders.

The trial court denied defendant's motion for a new trial and his automatic request to reduce the penalty. The court sentenced defendant to death. It imposed

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

but stayed two 25-years-to-life indeterminate sentences for the enhancements under sections 12022.53, subdivision (d) and 1192.7, subdivision (c)(8). The court also imposed but stayed a three-year sentence on defendant's conviction of being a felon in possession of a firearm. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase Evidence

#### 1. Overview

Defendant physically and emotionally abused his wife Claribel Burgos (Clari),[2] his daughter Vallerie Cage (Vallerie), and members of his wife's family for years. His abuse included threats to kill his wife and her family. In October 1998, Clari left defendant with the help of her mother Brunilda Montanez (Bruni). Clari took both of her and defendant's children, Vallerie and Micky Cage, Jr. (Micky Jr.), and secretly traveled to Puerto Rico where they stayed with extended family. Defendant was upset with Clari, wanted Micky Jr. back, and told friends that he felt like doing something to Bruni in order to get his son back. Defendant said he should "bust a cap in [Bruni's] ass" and that he "should just put a gun to [Bruni's] head and tell her to call [Clari]." At other times, defendant said he wanted to "fuck up" Bruni.

On the night of November 9, 1998, defendant hid a shotgun in a laundry basket of clothes and went to Bruni's house. When Bruni opened the front door, defendant fatally shot her in the shoulder, chest and face. The shot to Bruni's face was a contact wound that almost completely destroyed her head. Defendant then

---

[2]    Because defendant, his wife and his wife's family share surnames, we will use their first names, by which they were commonly referred to at trial, for clarity and convenience.

walked upstairs to the bedroom of Clari's 16-year-old brother David Burgos (David), where he fatally shot David in the chest at close range.

### 2. *Prior incidents of domestic violence*

Defendant and Clari met when they were both 14 years old. A few months later, defendant moved in with Clari's family, which included Clari's mother Bruni, Clari's younger brother David, and Clari's older, mildly intellectually disabled brother, Richard Montanez (Ritchie). Throughout their relationship, defendant and Clari intermittently lived with Clari's family. In December 1985, defendant and Clari had their first child, Vallerie.

In 1987, while defendant, Clari and Vallerie were living in the City of Bellflower with Clari's family, defendant asked Clari, who was sleeping, to get him some water. When Clari told defendant to get the water himself, defendant pulled Clari out of bed, dragged her down the stairs by her hair, and began choking her. After he forced Clari to get him a glass of water, defendant choked her again until she blacked out.

On another occasion when they were living with Clari's family in Bellflower, David, who was five or six years old at the time, began crying because Bruni had left to go to the store. Defendant told David he was a "momma's boy" and proceeded to punch and kick him. At one point, defendant stomped on David's head with his steel-toed boots. When Clari tried to intervene, defendant turned his attention to Vallerie. Defendant pulled Vallerie's legs over her head and compressed them into her body until her face turned blue.

In January 1991, when defendant, Clari, and Vallerie were living in Signal Hill, defendant and Clari had an argument. Defendant pushed Clari into the bathroom, choked her, and yelled at her not to follow him around. She denied that she had been doing so, but defendant smashed her mouth against the bathtub,

3

cracking her tooth. Defendant told Clari, "If you want to play, then we'll play." Clari understood this to mean that if she "messed with him," he would "teach her."

In August 1991, during an argument about money, defendant choked Clari, pulled her hair, and pushed her face down onto the living room couch, trying to smother her. He then dragged her into the kitchen and grabbed a knife. He pushed Clari to the floor and put the knife to her throat. Vallerie was present in the living room and kitchen, witnessing these events. Defendant dragged Clari into the bedroom, where he beat and choked her on and off for the rest of the night. Defendant told Clari, "You think I'm playing with you but I'm not, I'll kill you." The next morning, defendant, seeing the injured Clari, told her, "You look fucked up, I fucked you up didn't I?" He threatened Clari that if she called the police to report him, he would kill Vallerie.

In December 1994, defendant and Clari had their second child, Micky Jr. At this time, Clari was living in Perris with Vallerie, her mother, and her brothers. Defendant did not live with them at this time, but was still in daily contact with Clari. Clari had a new car that she bought for her commute to work. In January 1995, defendant came over one day and asked to use the car. Clari told him no. Defendant responded by starting to beat her. Clari ran outside, but slipped and fell in the grass. Defendant grabbed a brick and quickly jumped on top of her, hitting her in the face with the brick. Clari blacked out, and when she revived, there was a lot of blood in her eyes. She heard defendant say that he knew she would call the police. He told her that he was not going back to jail. Vallerie and David were outside during the incident. Defendant forced them, along with Clari and Micky Jr., into Clari's car. Dizzy and hurt, Clari begged defendant to take her to the hospital. Defendant said he would, but instead he drove around for hours. Clari saw in the visor mirror that her forehead was "flapping" and looked "like ground beef." She used a diaper to mop up the blood; when the diaper was saturated, she

4

used her shirt.  More than seven hours later, defendant finally drove to a hospital and let Clari go inside, after coaching her on what to say.  He threatened that if she said anything to get him arrested, he would kill their children.  Fearful of defendant, Clari claimed at the hospital that she had hurt herself by slipping at a store.

Clari needed numerous stitches to close the wound to her forehead, the scar of which was visible at defendant's trial in 2003.  Clari also lost her front teeth and had to visit an oral surgeon to attempt to realign her jaw.  At the time of trial, Clari's mouth still did not close properly.  It took six months to receive dentures to replace her teeth.  On numerous occasions thereafter, defendant would throw her dentures away or hide them so that she would have to go to work humiliated.  Twice, Vallerie had to go to the dumpster to retrieve Clari's dentures for her.

After Bruni purchased a house in Moreno Valley, Clari and her children moved back in with defendant at an apartment a few miles from Bruni's house.  One day, when Vallerie was 10 or 11 years old, she returned from school early and saw another woman sitting on their couch.  Defendant "dared" Vallerie to tell Clari about the woman.  When defendant found out that Vallerie had done so, defendant dragged Vallerie into the bathroom.  Using clippers, he cut off all of her long hair, and made her go to school bald.  When Clari bought a wig for Vallerie to wear, defendant took it from Vallerie and would not let her wear it again.

Clari decided to leave defendant for good after he beat her with the brick.  She began to secretly give money to her Aunt Lydia to hold for her, and she started to look for a new job and new apartment.  Because her job hours were flexible, she was able to go to interviews either before work or during her lunch break.  At first, she would change clothes at home, but defendant became suspicious that she was seeing somebody else.  She started hiding the clothes she needed for her interviews.  Defendant remained suspicious.  He insisted on driving

5

to work with her. He became more and more aggressive. He would do things such as put sugar in her gas tank, shift the car into park while Clari was driving on the freeway, and tear up her paycheck and flush it down the toilet. He would not leave her alone with their children. He would not let her sleep, but would keep her up all night arguing. He told her that if she ever left him, he would first take Micky Jr. and then kill her, Vallerie, and her other family members, including her mother, Bruni.

On the morning of October 15, 1998, a day Clari had a job interview scheduled, defendant again insisted upon driving to work with her. During the drive, Clari told defendant that there was not enough gas in the car for him to drop her off and pick her back up. Defendant grabbed Clari's purse to look for money; finding none, he threw her purse out of the car window and onto the freeway. Clari drove back and retrieved her purse. As soon as she had the purse, however, defendant again threw it out the window. When defendant asked if she was going to get it, she responded "no" and continued to drive to work. Clari decided at that point that she would take her children and leave defendant that day.

Clari called Bruni, telling her she could not take it anymore, and was leaving defendant. She asked Bruni to pick up Vallerie and Micky Jr. and bring them to work. Clari then called Vallerie, told her they were leaving, and asked her to put clothes for the three of them in a trash bag. Clari told her boss she was leaving her job. Bruni picked Clari up from work with the children. Bruni arranged for her and the children to stay with a friend of hers until they could fly to Puerto Rico, where they could stay with relatives. Clari and the children left for Puerto Rico a few days later.

Clari subsequently called her mother and her brother David from Puerto Rico. Both reported that defendant had been calling them. Defendant, who had obtained Bruni's work information, called Bruni at work several times. He also

6

drove through Bruni's neighborhood at least once a week during the weeks Clari and the children were gone.

### 3. *The prosecution's evidence of the homicides*

In October and November 1998, Kevin Neal and Jason Tipton lived in an apartment below defendant's unit. The three men often spent weekends together having barbeques, drinking, smoking, and playing dominoes. After Clari left with the children, defendant told Tipton how upset and angry he was that Clari had taken his son and that he did not know where they were.[3] Defendant told Tipton that he wanted to go to his mother-in-law and put a gun to her head to find out where Clari had taken his son. Tipton heard defendant say that he should "bust a cap in [Bruni's] ass" and that he "should just put a gun to her head and tell her to call my wife." He said that he felt like "doing something to Clari's mom to get [his] son back." At other times, he said he wanted to "fuck up" Clari's mother. Defendant showed Tipton the shotgun that he owned and the ammunition inside it.

Defendant also told Neal how upset he was that his wife had taken his son away. Defendant called Bruni a "bitch" and was angry because she would not tell him where his wife and children were. Neal heard defendant say he wanted to confront Bruni to find out where his family was. Like Tipton, Neal had seen defendant's shotgun at defendant's apartment.

On the evening of November 9, 1998, defendant, Tipton and Neal were playing dominoes and watching football. They were all drinking and smoking marijuana. Defendant seemed a little high, but not very drunk. After the football game ended, defendant, wearing a long dark Raider's jacket, left Tipton's apartment with a friend. The friend drove defendant to Bruni's house.

---

[3] Tipton died in an accident before defendant's trial began. The trial court permitted his preliminary hearing testimony to be read to the jury.

7

Sarah Phipps, who lived with her parents and brother Steve next door to Bruni, recalled hearing Bruni's dog barking around 10:30 or 10:45 p.m. on November 9, 1998. The dog barked only a couple of times, stopping relatively quickly, as it usually did if it knew the person who came to the door. She estimated that it was between two and five minutes from when the dog stopped barking to when she heard three loud bangs in quick succession, followed by another loud bang.

Another neighbor of Bruni's, Adrian Valdez, also heard two sets of loud banging noises around the same time that night. He went outside to investigate and saw a man wearing a long coat standing across the street at Bruni's house. The man started walking toward Valdez's house, noticed Valdez, waved and then mumbled something to him. The man continued to cross the street, went up onto the sidewalk and walked away from Valdez. When an alarm sounded from the direction of Bruni's house, the man started to run. The coat he was wearing flared and Valdez noticed that the man was carrying an object that looked like a rifle.

Bruni's son Ritchie had gone out with Steve Phipps that night to watch the televised football game at a bar. After the game, Ritchie called Bruni to ask her to come pick him up. Bruni agreed to do so, but never arrived. Ritchie called home several times; one time defendant answered the phone. Ritchie and Steve ended up taking a taxi to Ritchie's home.

When they arrived at the house around 11:00 p.m., the front door to Bruni's home was open about an inch and there were some clothes in the driveway. While Steve went to get some money at his house to pay the cab driver, Ritchie opened the door to his home and saw his mother lying on the floor "with her face blown off." He hugged her. Then he ran upstairs where he saw his brother David lying dead. Ritchie screamed, hugged his brother, and managed to call 911.

The police arrived soon after Ritchie's call to 911. The first officer to arrive saw that Ritchie was hysterical and covered in blood and fleshy matter. Several officers tried to calm Ritchie down. Inside Bruni's house, the police encountered a "gruesome" homicide scene; blood, brain matter, and tissue were on the floor, ceiling, and walls. Bruni and David were shot dead. Several shell casings were found by Bruni's feet. Two shotgun slugs were found upstairs in David's room, which was also bloody. The door to David's bedroom showed damage consistent with it having been kicked. A pair of burgundy pants found in the driveway matched a burgundy top found in a laundry basket located inside the entryway. Clari later recognized the clothes in the laundry basket as belonging to her and defendant. She recognized the basket as one that defendant had previously used to conceal two guns that he brought into their apartment.

Dr. Daniel Garber, the forensic pathologist who performed the autopsies of Bruni and David, testified that Bruni suffered three gunshot wounds; one to her right shoulder, one to her chest, and one to her head. The shot to her head was consistent with the shotgun being placed in or close to her mouth. The shots were fired in rapid succession, but the head wound was probably the final shot as it resulted in the massive destruction of Bruni's head, leaving only her chin and jaw. One of Bruni's thumbs was severed and her other thumb was almost severed. These wounds were consistent with Bruni putting up her hands to protect herself. The cause of Bruni's death was multiple gunshot wounds.

Dr. Garber testified that David suffered two different shotgun wounds, one to the chest and one to his left arm. The shotgun barrel would have been within a foot of David when it was fired and the wounds were consistent with David raising his arm to defend himself. The gunshot wound to David's chest was the cause of his death.

9

Police located a shotgun with a live round in the magazine and some shell casings in a bush along a trail that defendant was known to use as a shortcut between his apartment and Bruni's house. The expended shotgun shells recovered from inside the house came from the shotgun that was found and the recovered slugs probably came from that gun. In the same area, police found cigarette butts and packs consistent with the brand defendant smoked. Police also found several boot prints. According to a criminalist, the left boot recovered from defendant's apartment "probably" made one of the impressions and the right boot recovered "could have" made one of the other impressions.

After defendant was arrested, police collected the clothing he had been wearing the night Bruni and David were killed. A tracking dog was allowed to sniff the shorts that defendant had been wearing. The dog traced defendant's scent up to the front door of Bruni's house, then along a route matching that of the man Valdez had seen that night, and onto the trail that defendant used as a shortcut. The dog stopped several times in locations where evidence had been found, including the bush under which the shotgun had been found.

Defendant's pants, shorts, and swabs taken from his leg and the recovered shotgun tested positive for human blood. A prosecution DNA expert testified that Bruni's DNA profile was an included source for the bloodstains found on defendant's pants, with defendant and David excluded as possible sources. Another criminalist, using a more current DNA testing method, testified that the stains on defendant's pants matched Bruni's DNA.

### 4. *The defense case*

Defendant did not present any evidence at the guilt phase of trial. In closing argument, defendant's counsel argued that the DNA evidence was not certain and the circumstantial evidence linking defendant to the killings was not

10

sufficient proof for the jury to find him guilty of first degree murder beyond a reasonable doubt.

## B. Penalty Phase Evidence

### 1. *The prosecution's case*

The prosecution introduced evidence of defendant's prior criminal activities involving the use or attempted use of force or violence or the express or implied threat to use force or violence (§ 190.3, factor (b)), as follows:

In July 1986, defendant and another man were arrested for possession of deadly or dangerous weapons. Defendant told the arresting officer that his companion planned to beat up a person who owed him money and defendant was along to help if necessary.

In January 1987, defendant stole from Nancy Icenogle, a friend of Clari, the German Luger nine-millimeter handgun that her grandfather had brought home as a memento from World War II. When confronted, defendant refused to return the gun and told Icenogle that it was her word against his.

In April 1987, defendant viciously beat 16-year-old William Hinton, who he believed had taken some money from him. As defendant was hitting Hinton with a piece of wood with a screw or nail sticking out of it, he yelled that Hinton needed to die. When Icenogle screamed for defendant to stop, defendant hit her too. Bruni intervened and made defendant stop. Icenogle spoke with the police when they arrived. A few days later, defendant accused Icenogle of "ratting him out," and threatened to kill her.

In connection with the 1988 incident in which defendant beat and kicked then five- or six-year-old David, evidence was presented that David suffered permanent injury, including repeated severe headaches every couple of weeks.

11

In April 1990, defendant hit, kicked, choked, and slammed into a wall Mary Roosevelt, the mother of his other daughter, Felisha Cage.

In connection with the August 1991 incident in which defendant beat Clari and held a knife to her throat, evidence was presented that defendant subsequently resisted arrest. It required three officers to subdue him.

In December 1992, defendant held Vallerie up by one arm with her feet dangling off the ground and hit her with a belt. When Clari tried to intervene, defendant pushed her out of the way. He told Clari that Vallerie was his child and he would "hit her any way [he] want[ed]," with as much force as he wanted. Vallerie testified that defendant had been beating her that day with a belt buckle and that she called the police. She regretted doing so because she got in worse trouble and was sent to the closet for long periods of time. Vallerie sometimes spent entire days in the closet, including once on her birthday.

Vallerie also testified regarding an incident sometime in 1994 when defendant picked a fight with Ritchie and beat him badly. Ritchie suffered severe bruising and had to seek treatment at a hospital.

In June 1994, 15-year-old David Olson went to Bruni's house for tutoring despite his fear of defendant, who was angry with him for refusing to loan defendant a set of free weights. When defendant arrived at Bruni's home, he confronted Olson, picked him up and threw him into some bushes outside. Defendant told Olson's mother that if she called the police he would kill her and her son and burn their house down. Defendant then exposed himself to Olson's mother. Police were called and arrested defendant after a violent struggle. Defendant broke out the rear window of the patrol car and had to be subdued with pepper spray. Defendant threatened to kill Olson and Olson's father. Defendant said that if he didn't kill Olson, he would "get 18th Street after him," which Olson understood as a reference to a Los Angeles street gang.

12

Defendant's sister-in-law, Traci Thompson, testified regarding an incident involving Vallerie refusing to eat her vegetables. In response, defendant took her into her room where he hit her and slammed her into the wall. When Vallerie came out of her room, she was crying and shaking, and her nose was bleeding.

The parties stipulated that defendant had previously been convicted of two felonies. Specifically, he was convicted in 1988 of selling cocaine, for which he was sentenced to three years in prison, and he was convicted in 1991 of spousal abuse of Clari, for which he was sentenced to two years in prison. (§ 190.3, factor (c).)

As additional evidence of the circumstances of the crime (§ 190.3, factor (a)), the prosecution presented the testimony of Dr. Alan Waxman, a physician with Cedars-Sinai Imaging Center and director of the nuclear medicine and imaging program there, regarding defendant's October 2002 positron emission tomography (PET) scan. In Dr. Waxman's opinion, defendant's scan reflected a normal brain. He questioned the methodology used by defense expert Dr. Wu to conclude otherwise and suggested Dr. Wu's methods would produce "abnormalities" in almost every PET scan.[4] Dr. Waxman also testified that there are inherent weaknesses in the use of a PET scan as a diagnostic measure for brain injury or abnormality.

Evidence was also presented that defendant pretended to be physically ill and to have mental difficulties when police were trying to interview him after his arrest for the killing of Bruni and David.

---

[4] Dr. Waxman testified after defendant's expert, Dr. Joseph Wu, who was allowed to testify out of order during the prosecution's case in aggravation to accommodate his schedule.

13

The prosecution presented victim impact testimony from Clari, Vallerie, Bruni's mother Celena Rodriguez, and Bruni's sister Lupe Quiles.

## 2. *The defense case*

Dr. Joseph Chong-Sang Wu, an associate professor at the University of California, Irvine School of Medicine, and clinical director for the university's brain imaging center, testified regarding the PET scan he performed on defendant in October 2002. According to Dr. Wu, defendant's scan was consistent with his having suffered a brain injury and with a diagnosis of schizophrenia. The possibility of schizophrenia was confirmed, in Dr. Wu's opinion, by medical records indicating defendant was taking large doses of antipsychotic medications and a Social Security disability benefits report indicating defendant had classic symptoms of schizophrenia. According to Dr. Wu, antipsychotic medication taken by a person with schizophrenia would result in a reduction of hallucinations and other symptoms, but a person without schizophrenia would be "knocked flat" by the dosage of medication prescribed for defendant: that defendant could take and tolerate the medication would validate a diagnosis of schizophrenia. Dr. Wu also reviewed records indicating defendant had suffered head trauma.

Dr. Boniface Dy, a psychiatrist with Riverside County detention mental health services, testified that he had seen defendant since June 2000 every 25 to 30 days to review his medications, which included several antipsychotic medications.

Defendant's daughter Felisha testified that she saw defendant about once a month before he was incarcerated and that he had never been violent toward her.

Defendant's mother, Emily Farmer, testified that defendant's behavior changed as a child once he was diagnosed with diabetes. Defendant's grades had always been poor, but after his diabetes diagnosis he became an even slower learner. According to Farmer, when defendant was about 15 years old, he ran into

14

a light pole while playing football and had to have his jaw wired for about eight months. Farmer told the jury that the last time she saw defendant before the murders was in late October 1998. At that time he seemed dirty, unkempt and distant. A week after the murders, she saw him in jail. He was trembling and shaking. He did not seem to recognize her.

### 3. *The prosecution's rebuttal case*

The prosecution re-called Vallerie and Clari to testify as rebuttal witnesses.

Vallerie described accompanying defendant to the medical evaluation necessary to qualify him for Social Security benefits. According to Vallerie, defendant enlisted her participation to help him appear "crazy." At the Social Security office, defendant talked about being abducted by aliens, made strange faces, and laughed out of context. Vallerie testified that defendant was in fact fully rational and understood what was happening around him. She said that he also "faked out" the jail doctors.

Clari testified that defendant faked his mental illness and lied on his Social Security application in order to receive monthly disability benefits. According to Clari, defendant would often brag about cheating the Social Security agency and fooling doctors. He took the prescribed medications only when his case was up for reevaluation because he knew the doctors would check his blood. When he took the antipsychotic medication, he would sleep most of the day.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. *Admission of the evidence of defendant's past crimes and bad acts against his family*

Prior to trial, the prosecutor sought a ruling allowing the admission of defendant's 13 separate prior acts of abuse of Clari, one prior act of abuse of David, three acts of abuse of Vallerie, and general evidence of the repeated abuse

of Ritchie. The prosecutor argued defendant's past crimes and bad acts against his wife and family were relevant and admissible pursuant to Evidence Code section 1101, subdivision (b) (hereafter Evidence Code section 1101(b)), principally as evidence of motive, but also to establish identity and intent. Defendant objected and sought to exclude the evidence, arguing it was irrelevant because there was no evidence of defendant's ever previously behaving in a violent or aggressive manner toward Bruni, who was the family matriarch. Defendant also claimed the evidence was too remote and was simply propensity evidence that would unfairly appeal to the jury's emotions. He contended that admission of the evidence would violate his federal due process rights.

Expressly finding that the probative value of the evidence outweighed the prejudicial effect for purposes of Evidence Code section 352, the trial court ruled that eight of the prosecutor's identified incidents of defendant's past abuse of Clari, plus the incidents of defendant's abuse of David and Vallerie, were admissible under Evidence Code section 1101(b). The trial court determined that the evidence of defendant "constantly beat[ing] up" Ritchie would be excessive under section 352 and ruled such evidence inadmissible.

Defendant contends on appeal that the trial court erred in allowing introduction of his past incidents of abuse of Clari, David and Vallerie, claiming that the evidence was irrelevant, cumulative, and inflammatory and was used for the impermissible purpose of showing his propensity for violence.

The rules governing the admissibility of evidence under Evidence Code section 1101(b) are well settled. Evidence of defendant's commission of other crimes, civil wrongs or bad acts is not admissible to show bad character or predisposition to criminality, but may be admitted to prove some material fact at issue such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. (Evid. Code, § 1101; *People v. Jones* (2013) 57

16

Cal.4th 899, 930; *People v. Hovarter* (2008) 44 Cal.4th 983, 1002.)  Because evidence of a defendant's commission of other crimes, wrongs, or bad acts " 'may be highly inflammatory, its admissibility should be scrutinized with great care.' " (*People v. Medina* (1995) 11 Cal.4th 694, 748.)

" 'In cases in which the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility "depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity." ' [Citation.]  A somewhat lesser degree of similarity is required to show a common plan or scheme and still less similarity is required to show intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.)" (*People v. Roldan* (2005) 35 Cal.4th 646, 705.)  Where other crimes or bad conduct evidence is admitted to show motive, " 'an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself ' " (*People v. Lewis* (2001) 26 Cal.4th 334, 370), the other crimes or conduct evidence may be dissimilar to the charged offenses provided there is a direct relationship or nexus between it and the current alleged crimes. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15; *People v. Daniels* (1991) 52 Cal.3d 815, 857; *People v. Thompson* (1980) 27 Cal.3d 303, 319, fn. 23.)

We review the trial court's ruling for abuse of discretion.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405; *People v. Jones, supra*, 57 Cal.4th at p. 930.)

Here the prosecutor argued, and the trial court found, that the prior incidents of abuse were important evidence of defendant's motive.  We agree. Motive, though it was not an ultimate fact put at issue by the charges or the defense in this case, was probative of the material issues of identity and intent, as well as premeditation and deliberation.  (See *People v. Demetrulias*, *supra*, 39

17

Cal.4th 1, 14-15; *People v. Roldan, supra*, 35 Cal.4th at p. 707; *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 374-375.) The proffered evidence, if believed by the jury, reflected that defendant demanded Clari comply with his requests and reacted with anger, hostility, and punishment when she did not promptly meet his demands. Indeed, the evidence showed that over the course of many years, defendant sought to exert power and control over Clari, Vallerie, and David by both threatening and committing violent, demeaning, and abusive acts against them. His threats included expressions of his intent to harm other family members in order to enforce his will. Defendant specifically sought to prevent Clari from leaving him by aggressively interfering with her normal activities and threatening to kill her and her family, including Bruni. The evidence reflected that defendant retaliated when thwarted. A logical inference from the evidence of the prior assaultive incidents would be that defendant carried out his threats by committing the charged crimes, intending them as retribution for Clari's leaving him and taking his son. A direct relationship or nexus, thus, existed between the prior incidents and the charged crimes. (*People v. Daniels, supra*, 52 Cal.3d at p. 857.)

Under the circumstances, there was no abuse of discretion by the trial court under Evidence Code section 352 in allowing the introduction of the prior abuse evidence. The probative value of the evidence to explain defendant's motive to commit the charged crimes was significant and not merely cumulative and unnecessary, as defendant claims. Contrary to defendant's argument, the evidence of motive was specific and not so general as to be meaningless. The evidence of motive, found in the evidence of his prior behavior, also corroborated the testimony of defendant's apartment neighbors Tipton and Neal that defendant threatened to harm Bruni after Clari took his son away from him. It further supported the evidence of defendant's identity as the killer, provided a fuller explanation for the killings, and supplied important indirect evidence of

18

defendant's intent, which the jury also reasonably could have considered on the issue of premeditation and deliberation. Moreover, the evidence was not *unduly* prejudicial. (Evid. Code, § 352, subd. (b).) As we have repeatedly explained: " 'In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.) " ' "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.) The "prejudice" which section 352 seeks to avoid is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*." ' " (*People v. Gionis, supra*, at p. 1214.) Finally, we note that the jury was given a limiting instruction regarding its consideration of the evidence (CALJIC No. 2.50), which was emphasized by the prosecutor during her closing argument. We presume the jury followed the instruction.

### 2. *Sufficiency of the evidence of premeditation and deliberation*

Defendant contends the evidence of premeditation and deliberation was insufficient to support his convictions of first degree murder of Bruni and David. He argues that the first degree murder verdicts must, therefore, be reversed to preserve his constitutional rights to due process, to present a defense, and to a fair and reliable guilt and penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.)

Reviewing the entire record in the light most favorable to the judgment, we conclude that substantial evidence, that is, evidence which is reasonable, credible, and of solid value from which a rational trier of fact could find defendant guilty beyond a reasonable doubt, supports defendant's conviction of first degree murder of Bruni and David based on a theory of premeditation and deliberation. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069.)

19

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. (§ 189 ['willful, deliberate and premeditated killing' as first degree murder].) 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), "we 'identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing.' [Citation.] 'However, these factors are not exclusive, nor are they invariably determinative.' [Citation.] ' "*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 242.)

Addressing the *Anderson* factors, defendant contends that the evidence reflects he only planned a nonlethal confrontation with Bruni in an effort to discover where Clari had taken his son. He complains that if bringing a gun along were to demonstrate the required planning activity, every gun killing in California would qualify as premeditated and deliberate first degree murder. In defendant's view, his actions when he arrived at Bruni's house were consistent with a sudden and random "explosion" of violence rather than calm, calculated thought. He emphasizes that on the evening of the murders, he was drinking heavily and using drugs. Repeating some of his previous argument regarding the allegedly improper introduction of the prior abuse evidence, defendant contends that there was, in any

20

event, no evidence in his prior abuse of his wife and daughter that he had a motive to kill Bruni.

Defendant's view of the record is not the only possible, or even most likely, view of the evidence. To the contrary, the prosecution's evidence showed significant evidence of considered planning on the part of defendant, who repeatedly told his downstairs neighbors about his desire not only to confront Bruni after he could not locate Clari and his son, but to "fuck [her] up." On the night of the killings, he put on a dark jacket, hid a loaded shotgun in a laundry basket containing his and Clari's clothes, and got a ride over to Bruni's house. He took the laundry basket with the concealed gun up to the front door with him. Combined with his earlier statements, defendant's conduct reflects more than incidental possession of the gun. And, although defendant had been drinking and smoking marijuana earlier that night, defendant's apartment neighbor Neal testified that defendant seemed a little high, but not very drunk.

We also note our previous conclusion that the evidence of prior abuse was properly admitted by the trial court to show, in part, defendant's motive in killing Bruni and David. Such evidence revealed a pattern of hostile, abusive conduct by defendant against Clari, Vallerie, and David. Defendant's threats of retaliation if his will was crossed included expressions of intent to harm and kill other family members, specifically including Bruni. Thus, a rational jury could find defendant went to Bruni's house with the intent to exact retribution or revenge after Clari defied him by leaving with the children. (*People v. Streeter, supra*, 54 Cal.4th at pp. 242-243.)

The jury reasonably could have inferred premeditation and deliberation from the manner of killing. The evidence showed that defendant entered Bruni's house and shot her three times in rapid succession. The shot to her head was consistent with defendant placing the shotgun in or close to her mouth. "[A]

21

close-range gunshot to the face is arguably sufficiently 'particular and exacting' to permit an inference that defendant was acting according to a preconceived design." (*People v. Caro* (1988) 46 Cal.3d 1035, 1050; accord, *People v. Thompson* (2010) 49 Cal.4th 79, 114-115 [a close-range shooting without any provocation or evidence of struggle reasonably supports an inference of premeditation and deliberation].) And, instead of then leaving the home, defendant stepped over or around Bruni's bloody body and proceeded up the stairs to David's room. Defendant, thus, had time to reflect on his brutal killing of Bruni before he kicked in David's bedroom door and fatally shot David. Defendant fired twice again at close range, one of the shots being to David's chest.

Finally, a jury could have inferred from the evidence of defendant's actions in and outside the house after the shootings that he was not possessed by a sudden rage, but was acting in the course of premeditated killings. Specifically, there was evidence from Ritchie that defendant answered one of his phone calls to the house at a time when the evidence suggested that the killings had just occurred. And there was evidence from Bruni's neighbor, Valdez, that when he went outside to investigate the source of loud banging noises, he saw a man (defendant) wearing a long coat standing outside Bruni's house. Defendant then walked toward Valdez's house, noticed Valdez, waved, mumbled something, and continued walking. Defendant began to run only when an alarm sounded. These actions hardly seem to reflect a person who had been overcome by sudden anger and acted as the result of rash impulse.

The evidence is more than sufficient to support a conclusion that defendant premeditated and deliberated the murders of Bruni and David.

### 3. Sufficiency of the evidence of lying in wait

Defendant contends insufficient evidence was presented to support his convictions of first degree murder on a lying-in-wait theory and the jury's true finding on the special circumstance of lying in wait.  He argues that as a result he was denied his constitutional rights to due process and a fair trial.  (U.S. Const., 5th, 6th, 14th Amends.; Cal. Const., art. I, §§ 5, 15 & 16.)  We reject the claim.

At the time of the murder of Bruni and David, " 'the requirements of the lying-in-wait special circumstance were slightly different from, and more stringent than, the requirements for lying-in-wait first degree murder.  [Citation.]  Whereas lying-in-wait first degree murder required only that the murder be perpetrated "by means of" lying in wait (§ 189), the lying-in-wait special circumstance applied to murder committed "*while* lying in wait" (§ 190.2, former subd. (a)(15), italics added).'  [Citation.]  Further, the lying-in-wait special circumstance requires intent to kill, while lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death."  (*People v. Streeter, supra*, 54 Cal.4th at p. 246; see *id*., fn. 7.)  Where the evidence supports the special circumstance, it necessarily supports the theory of first degree murder.  (*People v. Moon* (2005) 37 Cal.4th 1, 22.)

"The lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' "  (*People v. Carpenter* (1997) 15 Cal.4th 312, 388; accord, *People v. Mendoza, supra*, 52 Cal.4th at p. 1073.)

"We have explained the elements of the lying-in-wait special circumstance as follows.  ' " 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct.  It is

23

not required that he be literally concealed from view before he attacks the victim.' " ' [Citation.]" ' [Citation.] As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " [Citation.]' [Citation.] 'The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are the hallmark of a murder by lying in wait." ' " (*People v. Mendoza, supra*, 52 Cal.4th at p. 1073, fn. omitted.)

Here, there was evidence that defendant concealed his true intent and purpose even though he did not conceal his presence at Bruni's door. Defendant hid his shotgun in a laundry basket containing his and Clari's clothes and took the laundry basket with him up to Bruni's door. A jury could rationally deduce from these facts that defendant planned and undertook a deliberate subterfuge aimed at making his presence appear to be an innocuous offer to return Clari's clothes or request to do laundry so that Bruni would open the door and admit him. The ruse disguised his intent to kill.

Defendant claims, however, that even if his use of the laundry basket could be considered a planned concealment, there is insufficient evidence of the second requirement — a substantial period of watching and waiting for an opportune time to act. However, "we have never placed a fixed time limit on this requirement. Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is also not critical.' " (*People v. Moon, supra*, 37 Cal.4th at p. 23.) The lying in wait need not continue for any particular period of time provided that its duration is substantial in the sense that it shows a state of mind equivalent to premeditation or deliberation. (*People v. Mendoza, supra*, 52 Cal.4th at p. 1073 &

24

fn. 6.) In this case, the evidence did not establish the specific length of time that defendant waited for Bruni to open the front door, but nothing in the trial record suggests it happened instantaneously upon defendant's arrival at the house.[5] A rational jury could infer that there was some period of watching and waiting at the door. Similarly, although the record does not establish the precise amount of time after Bruni opened the door that defendant spent interacting with her before he pulled out the shotgun and shot her, Sarah Phipps, one of Bruni's neighbors, testified Bruni's dog barked briefly around 10:30 or 10:45 p.m. and that shots were fired several minutes later. Such testimony could support an inference that defendant conversed with Bruni for a few minutes before removing the gun from the basket and shooting her. During such time defendant could have reflected on his intentions, such that his subsequent actions in taking the shotgun out of its hiding place and shooting Bruni and then proceeding upstairs to David's room were not the product of a rash impulse. (*People v. Russell* (2010) 50 Cal.4th 1228, 1245 ["Even a short period of time is sufficient to overcome an inference that a defendant acted rashly."].)

It is also apparent from the record that defendant's surprise attack on Bruni and David followed in a continuous flow of events upon defendant's successful use of his ruse to persuade Bruni to open her front door. The jury could reasonably determine that defendant's actions met the requirement of an

---

[5] In his opening brief, defendant discusses purported evidence regarding his actions when he arrived at Bruni's house, having received a ride from his friend J.D. Sovel. The citations given for this evidence are to the transcript of the testimony of Investigator Gutierrez at defendant's preliminary hearing. Investigator Gutierrez was not called as a witness at defendant's trial, nor was defendant's friend J.D. Sovel. Thus, this "evidence" was not before the jury and is not considered by the court.

immediate surprise attack on unsuspecting victims from a position of advantage. (*People v. Carpenter, supra*, 15 Cal.4th at p. 388.)

Contrary to defendant's argument, this case is not similar to *People v. Lewis* (2008) 43 Cal.4th 415, 507-509, in which we vacated a lying-in-wait special circumstance for insufficient evidence of watching and waiting. We did so there because we concluded that the statements of a codefendant should not have been admitted against the defendant and that such statements "supplied the only evidence of a plan and agreement to find someone driving a nice car, bump the car so the driver would stop, steal the car and any valuables therein, and shoot the driver if he or she did not cooperate. It also supplied the only evidence that [the victim] was purposefully trailed for any period of time before [another codefendant's] car collided with his truck." (*Id.*, at p. 509.) No such deficiencies in the evidence are present here.

Although the evidence of watching and waiting in this case is not overwhelming, it is sufficient to support the jury's first degree murder verdict and true finding on the special circumstance allegation.

### 4. Defendant's challenges to the lying-in-wait murder and lying-in-wait special circumstance instructions

Defendant's jury was instructed with CALJIC No. 8.25 regarding the elements of lying-in-wait first degree murder and with CALJIC No. 8.81.15 concerning the requirements of the lying-in-wait special circumstance. Although defendant did not object to the instructions at the time of trial, he now claims on appeal that CALJIC No. 8.81.15 was lengthy, confusing, and internally inconsistent. He asserts that the instruction also conflicted with other instructions defining premeditation and deliberation. And, according to defendant, the use of identical language in CALJIC No. 8.81.15 and CALJIC No. 8.25 regarding the temporal elements of lying in wait left the jury with no meaningful way to separate

26

lying-in-wait murder from the lying-in-wait special circumstance. Defendant argues that giving these two instructions violated his constitutional rights to due process, to a fundamentally fair trial, and to a reliable verdict and penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7 & 15.) Defendant's claims are reviewable to the extent they affect his substantial rights (§ 1259), but we have rejected such claims on the merits before and do so again.

CALJIC No. 8.81.15 is not by its length or terms " 'impossible to understand and apply.' " (*People v. Cruz* (2008) 44 Cal.4th 636, 678.) It is not internally inconsistent in its treatment of the temporal element of lying in wait, which properly references the concepts of premeditation and deliberation. (*People v. Bonilla* (2007) 41 Cal.4th 313, 332-333.) Therefore, there was no conflict with other instructions. And, the use of the same language in both CALJIC No. 8.81.15 and CALJIC No. 8.25 concerning the period of time necessary for lying in wait is appropriate. The difference between lying-in-wait murder and the lying-in-wait special circumstance does "not touch on th[is] durational element of lying in wait." (*People v. Stevens* (2007) 41 Cal.4th 182, 202, fn. 11; accord, *People v. Carpenter, supra*, 15 Cal.4th 312, 390-391.) The difference lies in the required mental states (*People v. Stevens, supra,* at pp. 202-203) and, at the time of defendant's crimes, in the requirement of the special circumstance that the defendant intentionally killed the victim "while" lying in wait. (§ 190.2, former subd. (a)(15), as amended by Stats. 1995, ch. 478, § 2, p. 3564; *People v. Ceja* (1993) 4 Cal.4th 1134, 1140, fn. 2.) As we have held before, the special circumstance of lying in wait instruction is constitutional. (*People v. Stevens, supra*, at pp. 203-204.)

27

*5. Constitutionality of the lying-in-wait special circumstance*

Defendant argues that section 190.2, subdivision (a)(15), the lying-in-wait special circumstance, unconstitutionally fails to perform the narrowing function required by the Eighth Amendment to the federal Constitution. This issue has been raised before and our cases have said that the lying-in-wait special circumstance, as we have interpreted it, has clear and specific requirements that sufficiently distinguish a murder committed while the perpetrator is lying in wait from other murders, so as to justify the classification of that type of case as one warranting imposition of the death penalty. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1310; *People v. Cruz, supra*, 44 Cal.4th at p. 678, and cases cited.) Defendant fails to persuade us to reconsider our prior precedent.

*6. The admission of purported victim impact testimony at the guilt phase*

During the guilt phase, Clari testified concerning her receipt in Puerto Rico of the news of the deaths of her mother and brother. She also described her shock after she returned to their home and observed the bloody crime scene, including the laundry basket of her clothes. Ritchie testified regarding his return to his house on the night of the killings and his observations of the bodies of his mother and brother. The testimony of neighbors Sarah and Steve Phipps, cab driver Wilhousen, Officer Heim, and Investigator Amicone touched on Ritchie's very emotional reaction to the crime scene.

Defendant does not challenge the admission of the testimony of Ritchie as a percipient witness, but he argues that the admission of the other testimony was improper victim impact testimony, irrelevant to the guilt phase of trial. He contends that any marginal relevance was vastly outweighed by its inflammatory effect, making its admission an abuse of the trial court's discretion. According to defendant, its introduction deprived him of his constitutional rights to due process,

a fundamentally fair trial, and a reliable determination of the penalty. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15 & 17.)

Defendant forfeited his claims by failing to object to any of the testimony on the grounds he now raises. (Evid. Code, § 353, subd. (a); *People v. Fuiava* (2012) 53 Cal.4th 622, 687; *People v. Zamudio* (2008) 43 Cal.4th 327, 354.) He does not persuade us that an objection would have been futile. The record does not reflect, as defendant claims, that the trial court disregarded his objections throughout trial. We see nothing improper about the trial court's occasional suggestion that counsel for both sides first try to work out their evidentiary disputes before it would rule on them. And, contrary to defendant's argument, nothing suggests that a timely admonition, if one had been requested and given, would not have cured any potential harm.

Moreover, even were we to consider defendant's contention, we would find no prejudicial error. The testimony of witnesses describing Ritchie's screams upon finding the bodies, as well as his subsequent crying and hysteria, was relevant to explain the inconsistencies between Ritchie's trial testimony and his initial interview with investigating officers at the scene. The testimony of Clari regarding her family's receipt of the telephone call regarding the deaths of Bruni and David and their breaking the news to Clari helped provide context and was part of the timeline of events from Clari's leaving defendant to her return to her mother's home after the murders. (*People v. Tully* (2012) 54 Cal.4th 952, 1013.) The evidence overwhelmingly established defendant was the individual who shot Bruni and David. The facts of the shootings were largely undisputed. And the jurors reasonably would expect that immediate family members would experience horror and distress in seeing and hearing about the killings.

*7. Admission of crime scene and autopsy photographs*

Defendant contends the trial court abused its discretion by admitting, over his objection, a number of gruesome crime scene and autopsy photographs. He claims that the photographs were irrelevant and substantially more prejudicial than probative. (Evid. Code, §§ 210, 350, 352.) Their admission, he argues, violated his state and federal constitutional rights to due process, a fair trial, and reliable adjudications at both phases of his capital trial. (U.S. Const., 5th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15 & 17.) We have rejected such arguments in the past, and do so again here.

As we have previously observed, " ' "[t]he admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" [Citation.] "[A] court may admit even 'gruesome' photographs if the evidence is highly relevant to the issues raised by the facts, or if the photographs would clarify the testimony of a medical examiner." [Citation.] "We have consistently upheld the introduction of autopsy photographs disclosing the manner in which a victim was wounded as relevant not only to the question of deliberation and premeditation but also aggravation of the crime and the appropriate penalty, all of which were at issue here. [Citations.]" ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1272.) "Finally, prosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses" (*People v. Gurule* (2002) 28 Cal.4th 557, 624) and do not have to forgo use of photographic evidence "merely because the defendant agrees with a witness or stipulates to a fact. . . . [T]he jury [is] entitled to see the physical details of the crime scene and the

30

injuries defendant inflicted on his victims." (*People v. Weaver* (2001) 26 Cal.4th 876, 933.)

Here, the parties sought at the start of the trial to resolve the issue of which photographs of the death scenes of Bruni and David, as well as which autopsy photographs, would be admitted into evidence. Counsel were able to stipulate to the use of some photographs over others, but there remained a number of photographs that the prosecution sought to introduce and to which defendant objected. The trial court carefully considered the possible relevance of each such photograph and whether a different, less disturbing photograph could suffice. The court noted that each of the proffered photographs showed something different that had probative value to the testimony of the pathologist, the cause of death and the extent of injuries. In ruling the photographs admissible, the court expressly found that their probative value outweighed their prejudicial effect. (Evid. Code, § 352.)

We have reviewed the photographs and agree with the trial court that they were highly relevant to the circumstances of the crime and the prosecution's theories of lying in wait and premeditated and deliberate murder. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 471 [crime scene photographs are relevant to establish the killer's mental state]; *People v. Hajek and Vo, supra*, 58 Cal.4th at pp. 1215-1216 [crime scene and autopsy photographs were relevant to prosecution's theory of murder and special circumstance].) They were relevant to assist the jury in understanding the testimony of the pathologist. (*People v. Gonzales, supra*, 54 Cal.4th at p. 1272.) They also helped explain the stress Ritchie was under after he encountered the scene and why he may have provided inconsistent statements to investigating officers. (*People v. Scheid* (1997) 16 Cal.4th 1, 15.) "The photographs were disturbing, but they were not unnecessarily so. They 'simply showed what had been done to the victim[s]; the revulsion they

induce is attributable to the acts done, not to the photographs.' " (*People v. Hajek and Vo, supra*, at pp. 1215-1216.)

We conclude the admission of the photographs fell well within the trial court's broad discretion. And because the trial court did not abuse its discretion in admitting them, there was no violation of defendant's constitutional rights. (*People v. Sattiewhite, supra*, 59 Cal.4th at p. 472.)

### 8. *Instructing the jury on motive with CALJIC No. 2.51*

Without objection, defendant's jury was instructed with CALJIC No. 2.51, on motive, as follows: "Motive is not an element of any of the crimes charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." Defendant now contends that the jury was erroneously instructed, thereby violating his constitutional rights to a fundamentally fair trial, due process and a reliable verdict and penalty determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7 & 15.) Defendant's claims are reviewable to the extent they affect his substantial rights (§ 1259), but as he recognizes, we have rejected similar claims on the merits before. We do so again here.

CALJIC No. 2.51 did not improperly allow the jury to determine guilt based on motive alone. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1168; *People v. Snow* (2003) 30 Cal.4th 43, 97-98.) The instruction did not improperly shift the burden of proof to defendant to show absence of motive to establish his innocence. (*People v. Sattiewhite, supra*, 59 Cal.4th at p. 474.) The juxtaposition of CALJIC No. 2.51 and CALJIC No. 2.52, the latter of which expressly instructed the jury that evidence of flight is not by itself sufficient to establish guilt, would not have caused the jury to believe motive by itself was sufficient.

32

(*People v. Livingston, supra*, at pp. 1168-1169.)  The instruction did not impermissibly reduce the prosecution's burden of proof and violate defendant's constitutional rights.  (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1357; *People v. Mendoza*, *supra*, 52 Cal.4th at pp. 1094-1095.)

9. *Instructing the jury on flight with CALJIC No. 2.52*

Without objection, defendant's jury was instructed with CALJIC No. 2.52, regarding flight as reflective of consciousness of guilt, as follows:  "The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." Defendant now contends on appeal that CALJIC No. 2.52 was erroneously given and violated his constitutional rights.  (U.S. Const. 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.)  Again, defendant's claims are reviewable to the extent they affect his substantial rights (§ 1259), but we conclude they are meritless.

"In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.'  [Citations.]  ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.]  Flight manifestly does require, however, a purpose to avoid being observed or arrested." '  [Citation.]  '*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so.' "  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)  Even though defendant returned to his apartment after the killings, where he was

33

arrested the next morning, he was observed by a neighbor to start running from the scene of the crimes only when an alarm sounded. Contrary to defendant's argument, the "circumstances" of his departure from the scene provided sufficient evidence of flight to warrant the flight instruction.

With respect to defendant's remaining claims concerning the instruction, we have recently explained: "Contrary to defendant's assertion, the flight instruction is not duplicative of general instructions as to the definition and sufficiency of circumstantial evidence. (See CALJIC Nos. 2.00, 2.01, and 2.02.) Indeed, instruction in language substantially similar to that given here is statutorily required when the prosecution relies upon evidence of flight 'as tending to show guilt.' (§ 1127c.) The flight instruction properly allows ' "the jury to determine to which offenses, if any, the inference [of consciousness of guilt] should apply" ' [citation] and 'does not address the defendant's specific mental state at the time of the offenses' [citation]. Nor is the flight instruction unfairly partisan and argumentative, or similar to the proposed defense instruction disapproved of in *People v. Mincey* (1992) 2 Cal.4th 408, 437, which 'invited the jury to "infer the existence of [the defendant's] version of the facts, rather than his theory of defense." ' [Citation.] Finally, the instruction does not 'create an unconstitutional permissive inference or lessen the prosecutor's burden of proof.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 967-968.)

### 10. *Instructions assertedly undermining the burden of proof*

Defendant contends the trial court gave several standard jury instructions that individually and collectively undermined and impermissibly lessened the requirement of proof beyond a reasonable doubt: CALJIC Nos. 1.00 (Respective Duties of Judge and Jury), 2.01 (Sufficiency of Circumstantial Evidence — Generally), 2.21.1 (Discrepancies in Testimony), 2.21.2 (Witness Willfully False),

34

2.22 (Weighing Conflicting Testimony), 2.27 (Sufficiency of Testimony of One Witness), 2.51 (Motive), 2.52 (Flight After Crime), and 8.83 (Special Circumstances — Sufficiency of Circumstantial Evidence — Generally).  We have repeatedly rejected the contention that these instructions compel or allow the jury to find a defendant guilty using a standard lower than proof beyond a reasonable doubt.  (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1226, and cases cited; *People v. Livingston*, *supra*, 53 Cal.4th at p. 1153, and cases cited.)  We continue to do so.

In his heading for this claim, defendant also references CALJIC No. 8.83.2 (Special Circumstances — Jury Must Not Consider Penalty), but makes no argument specific to that instruction.  Although the Attorney General speculates that defendant's reference to CALJIC No. 8.83.2 was meant to be a reference to CALJIC No. 8.83.1 (Special Circumstances — Sufficiency of Circumstantial Evidence to Prove Required Mental State), defendant does not concede such to be the case in his reply brief.  Therefore, we assume defendant meant what he wrote.  We see no reason to reach a different conclusion with respect to CALJIC No. 8.83.2.

We have also repeatedly rejected the contention that CALJIC Nos. 2.01 and 8.83 created an impermissible mandatory presumption that required the jury to accept any reasonable inculpatory interpretation of the circumstantial evidence unless defendant rebutted the presumption by producing a reasonably exculpatory interpretation.  (*People v. Parson* (2008) 44 Cal.4th 332, 358 and cases cited.)  We decline defendant's invitation to reconsider our prior conclusion in this regard.

## B. Penalty Phase Issues

### 1. *Admission of victim impact evidence*

As part of the prosecution's penalty phase case, Bruni's mother Celena Rodriguez, Bruni's sister Lupe Quiles, Clari and Vallerie provided testimony regarding the impact that the deaths of Bruni and David had on them and their families.

Rodriguez briefly described her large family, Bruni's childhood in Puerto Rico, the circumstances under which she learned of Bruni's death, and its impact on her. Quiles testified about her close relationship with Bruni and Bruni's children. She described her emotional reaction to the news of Bruni's death, her travel to California from Florida the day after the murders, and her visit to the scene of the murders. Quiles also described cleaning the blood, brain matter, and remnants of bone from Bruni's home. She disclosed that she secretly kept one piece of bone, which she believed to be Bruni's nose, as a memorial. Quiles described the continuing impact of the loss of Bruni and David on her, her family, and particularly on Ritchie, who was at the time of trial being cared for in a mental hospital. Clari testified about her closeness to David, who was like a son to her. She also testified regarding the guilt and emotional struggles that she suffered as a result of the deaths of her mother and brother. She noted that Ritchie had become aggressive toward her when she tried to care for him after the crimes and that he blamed her for the murders. Vallerie described David as being like a brother to her because of their closeness in age. They essentially grew up together, sharing experiences, thoughts and feelings. She also testified regarding her emotions after the death of Bruni and David and the effect of the loss on her and her family.

Conceding that the quantity of victim impact evidence here was not unusually large, defendant contends that the testimony was nevertheless highly prejudicial and rendered his trial fundamentally unfair. Defendant argues that the

admission of the testimony was erroneous under state statutes (Evid. Code, §§ 350, 352) and violated his state and federal constitutional rights. (U.S. Const., 5th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17 & 24.) Defendant forfeited his claims by his failure to object to the admission of the testimony on the grounds he now asserts. (Evid. Code, § 353; *People v. Weaver* (2012) 53 Cal.4th 1056, 1082; *People v. Kelly* (2007) 42 Cal.4th 763, 793.) And, in any event, were we to reach defendant's claims of prejudicial error, we would find they lack merit.

Victim impact evidence is permissible at the penalty phase of a capital trial under the Eighth Amendment to the United States Constitution (*Payne v. Tennessee* (1991) 501 U.S. 808) and we have repeatedly held such evidence admissible as a circumstance of the offense under section 190.3, factor (a) so long as it does not invite a purely irrational response from the jury. (*People v. Kopatz* (2015) 61 Cal.4th 62, 90; *People v. Brady* (2010) 50 Cal.4th 547, 574; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056-1057.) "Victim impact evidence is 'designed to show . . . each victim's "uniqueness as an individual human being." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 887.) Defendant does not persuade us to revisit our position.

We would also reject defendant's contention that the testimony in this case exceeded statutory and constitutionally permissible bounds.

Defendant first points to Clari's testimony when she responded, "How would you feel if you brought the devil to your mom's house and he did it to her?" Defendant contends that Clari's description of him as "the devil" constituted improper victim impact testimony because it fell within the prohibition of victim opinion testimony concerning the crime, the defendant, or the appropriate sentence. (See *Payne v. Tennessee*, *supra*, 501 U.S. at p. 830, fn. 2; see also *Booth v. Maryland* (1987) 482 U.S. 496, 502-503, 508-509.) We reaffirm the principle

37

that it is improper for family members to characterize, or offer their opinion about, the crime, the defendant, or the proper verdict (*Payne v. Tennessee*, *supra*, at p. 830, fn. 2; *People v. Collins* (2010) 49 Cal.4th 175, 229), but conclude Clari's statement did not violate such principle when it is placed in its proper context. Clari's rhetorical question was her response to the prosecutor's query regarding whether the deaths of her mother and brother would have affected her differently if they had died in a different manner. The prosecutor immediately followed up by asking Clari whether she was telling the jury that she felt responsible for their deaths. Clari agreed, stating that she was "old enough to know I'm not responsible, . . . but I still feel some guilt because I brought him to the house. I introduced him to the family." Thus, in context and as clarified by the prosecutor, Clari's single reference to defendant as "the devil" was little more than a way of expressing her feelings of guilt. Her testimony was simply a colorful means of explaining the impact of the crimes on her, and nothing in the record suggests that the jury would have understood Clari's statement literally. But even were we to view Clari's description as crossing the line between proper victim impact testimony and improper opinion, we also believe that there is no reasonable possibility that the jury would have returned a different sentence but for Clari's brief reference given the evidence of the callousness of the murders, defendant's prior convictions, his numerous prior incidents of violent domestic abuse and other criminal conduct, and the prosecutor's rebuttal of defendant's evidence of his impaired mental condition. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1246 [any error in admitting victim's family member's opinion could have had no appreciable effect on jury's determination]; see *People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [state law error occurring during the penalty phase is prejudicial when there is a reasonable possibility such error affected the verdict; the

38

reasonable possibility standard is the same, in substance and effect, as the harmless beyond a reasonable doubt standard for constitutional error].)

We also reject defendant's related claim that it was error for the prosecutor to ask Clari, Rodriguez, and Quiles how the deaths of Bruni and David impacted them differently than if the victims had died under different circumstances because the questions allegedly called for irrelevant speculation. The testimony of Rodriquez and Quiles was not speculative. Both compared their feelings regarding the death of Bruni to the actual feelings they felt when another immediate family member died of natural causes. Their testimony was relevant to the impact of the crimes on them. Moreover, we have previously found no error in the admission of such testimony, even when not tied to the specific death of another person. (*People v. Montes* (2014) 58 Cal.4th 809, 884.)

Nor was it improper for Rodriguez to testify concerning Bruni as a baby and as a young girl growing up in Puerto Rico, referencing some of Bruni's family photographs, or for Clari and Vallerie to provide similar evidence of David's family life. (*People v. Kopatz*, *supra*, 61 Cal.4th at p. 91.)

The testimony of Clari and Vallerie regarding the continuing adverse effect on Ritchie of his finding the bodies of his mother and brother, and the residual effect on him of the murders in general, was permissible even though Ritchie did not testify at the penalty phase. (*People v. Chism* (2014) 58 Cal.4th 1266, 1327.) "There is no requirement that family members confine their testimony about the impact of the victim's death to themselves, omitting mention of other family members." (*People v. Panah* (2005) 35 Cal.4th 395, 495.) Clari and Vallerie did not need to be experts to testify concerning their observations of Ritchie's words, conduct, living circumstances or the general impact of the crimes on him. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 130-131.) Nor are we are persuaded that admission of such testimony was unduly prejudicial, as defendant argues, because

39

the court failed to sua sponte instruct the jury that it could consider only such harm as was directly caused by defendant's act. Here, the evidence given by close family members who were intimately familiar with the particular impact of the crimes on Ritchie, who was intellectually disabled, supplied probative information regarding the gravity of defendant's offenses, which the jury was entitled to consider under the standard instruction given. (CALJIC No. 8.85.)

Last, we reject defendant's argument that Quiles's emotional testimony, including her description of cleaning up the bloody scene at Bruni's house and retaining of a piece of bone as a memorial, was cumulative, inflammatory and unduly prejudicial. Quiles's testimony provided a fuller description of the aftermath of defendant's crimes. It was not necessarily inflammatory just because it was emotional. (*People v. Verdugo* (2010) 50 Cal.4th 263, 299; *People v. Jurado* (2006) 38 Cal.4th 72, 133.) Nor was the testimony gratuitously graphic. Rather, it described part of the impact of the crimes on the witness. That she kept a piece of bone, which she believed to be Bruni's nose, might be viewed as somewhat macabre, but in light of the fact that many people retain the ashes of deceased loved ones, we do not view such testimony as inescapably inviting a purely irrational response from the jury in their penalty deliberations. Moreover, to the extent any of Quiles's testimony exceeded the scope of permissible victim impact testimony, we would find it harmless for the same reasons stated earlier.

### 2. The trial court's denial of defendant's requests to modify CALJIC No. 8.88

At trial, defendant requested three modifications to CALJIC No. 8.88, the standard penalty phase concluding instruction regarding the weighing of aggravation and mitigation and selection of the appropriate penalty. First, defendant asked that the following language be added: "In weighing the

40

aggravating and mitigating factors, you are not merely to count numbers on either side. You are instructed, rather, to weigh and consider the factors. You may return a verdict of life imprisonment without possibility of parole even though you should find the presence of one or more aggravating factors." Second, he requested that the term "totality" be removed from the part of the standard instruction telling the jury that "[i]n weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." And finally, he asked that the jury also be informed that "[o]ne mitigating circumstance may be sufficient for you to return a verdict of life imprisonment without possibility of parole."

The trial court denied defendant's first request on the ground that it was already covered by CALJIC No. 8.88 and the standard instruction was much clearer than the language proposed by defendant. The court denied defendant's second request because CALJIC No. 8.88's use of the word "totality" is not inappropriate when considered in the context of other language in CALJIC No. 8.88, which informed the jury that "[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." The court denied defendant's third request, finding that the language of CALJIC. No. 8.88 adequately conveyed the point.

Defendant contends the trial court's refusal of his requested modifications resulted in a violation of due process and failure to provide the specific and detailed guidance necessary to meet Eighth Amendment standards. We disagree.

41

"[T]he standard version of CALJIC No. 8.88, read as a whole, accurately describes the individualized, normative nature of the sentencing determination, and properly guides the jury's discretion in this regard." (*People v. Contreras* (2013) 58 Cal.4th 123, 170.) Indeed, we have held repeatedly that it is adequate to instruct the jury regarding its weighing of aggravation and mitigation and selection of the appropriate penalty using the standard version of CALJIC No. 8.88. (E.g., *People v. Lopez* (2013) 56 Cal.4th 1028, 1083; *People v. Howard* (2010) 51 Cal.4th 15, 39; *People v. Burney* (2009) 47 Cal.4th 203, 263-264, and cases cited.) A trial court may properly refuse to give requested instructions that are duplicative (*People v. Gurule*, *supra*, 28 Cal.4th at p. 659; *People v. Turner* (1994) 8 Cal.4th 137, 203) as was defendant's first requested modification.

The trial court also correctly refused defendant's second modification of CALJIC No. 8.88. The inclusion of the word "totality" in CALJIC No. 8.88 did not improperly suggest a quantitative judgment. "The instruction explained that '[t]he weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.' Thus, 'CALJIC No. 8.88 properly describes the weighing process as " 'merely a metaphor for the juror's personal determination that death is the appropriate penalty under all of the circumstances.' " [Citation.]' [Citation.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1316.)

Finally, as our cases have previously concluded, the trial court did not err in denying defendant's request to instruct the jury that one mitigating circumstance may be sufficient for a verdict of life imprisonment without possibility of parole. (*People v. Jones* (2012) 54 Cal.4th 1, 79-80; *People v. Salcido* (2008) 44 Cal.4th 93, 162-163.) "In addition, we have held such an instruction 'was misleading,

42

because it wrongly implied that at least one mitigating factor was needed to justify a sentence of life imprisonment without parole.' " (*Salcido*, *supra*, at p. 163, quoting *People v. Cook* (2007) 40 Cal.4th 1334, 1364.)

### 3. *The constitutional adequacy of CALJIC No. 8.88*

Defendant also raises a number of challenges to CALJIC No. 8.88 itself, claiming its use violated his federal constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendment and corresponding sections of the California Constitution. As defendant concedes, we have previously considered and rejected these arguments. We do so again because defendant fails to persuade us that our prior decisions were erroneous.

We repeat that CALJIC No. 8.88 is not inconsistent with section 190.3 nor is it unconstitutional for failing to inform the jury that if mitigating circumstances outweigh those in aggravation, it "shall" return a sentence of life without the possibility of parole. (*People v. Jones*, *supra*, 54 Cal.4th at p. 78; *People v. Lomas* (2010) 49 Cal.4th 530, 595.) "We once again reject the argument that our decision in *People v. Duncan* (1991) 53 Cal.3d 955, 978, erroneously concluded such an instruction was unnecessary." (*People v. Linton* (2013) 56 Cal.4th 1146, 1211.) "CALJIC No. 8.88: (1) is not unconstitutionally vague and does not impermissibly reduce the burden of proof necessary to impose the death penalty by using the 'so substantial' standard for comparing mitigating and aggravating circumstances [citations]; (2) properly explains the weighing process that a jury is required to perform [citation]; (3) properly cautions against a ' " 'mere mechanical counting of factors' " ' [citation]; (4) is not defectively 'death-oriented' because it fails to define or describe the penalty of life without the possibility of parole [citation]; (5) is not unconstitutional because it fails to instruct the jury that a single mitigating factor could outweigh multiple aggravating factors and by itself

could justify a verdict of life imprisonment without the possibility of parole [citation]; and (6) adequately defines mitigation [citation]." (*People v. D'Arcy* (2010) 48 Cal.4th 257, 303-304.)  Finally, as we explained earlier, the use of the word "totality" in the instruction does not make the instruction constitutionally defective. (*People v. Lewis*, *supra*, 46 Cal.4th at p. 1316.)

          *4. Symmetry in penalty phase instructions concerning jury unanimity*

Defendant contends his right to a fair and reliable penalty determination under the Eighth Amendment was violated by the lack of symmetry between CALJIC No. 8.85 and CALJIC No. 8.87.  Specifically, he complains that the jurors were instructed with a modified form of CALJIC No. 8.87, which informed them that they were not required to unanimously find the section 190.3, factor (b), other crimes evidence proved beyond a reasonable doubt, but they were not instructed in CALJIC No. 8.85 that they need not be unanimous in finding proof of any mitigating factors.  Conceding that the instructions given conformed to existing law, defendant nevertheless argues that the trial court should either have sua sponte deleted the language that "it is not necessary for all jurors to agree" from CALJIC No. 8.87 or inserted the same language in CALJIC No. 8.85.

First, defendant forfeited this claim by failing to raise it at trial. (*People v. Moore* (2011) 51 Cal.4th 1104, 1139-1140.)  Second, the claim is meritless, as we explained in *Moore*:  "There is no right to parity of jury instructions . . . ; both parties simply have the right to instructions that properly explain the law.  The nonunanimity instruction the trial court gave helped to avoid possible confusion regarding the sentencing factor that had a burden of proof, by telling the jury that, unlike at the guilt phase and despite the same beyond a reasonable doubt standard, unanimity was not required.  (See also *People v. Jennings* (1988) 46 Cal.3d 963, 988 [trial court did not err by instructing the jury that unanimity was not required

44

for factor (b) evidence].)  That we concluded the trial court's refusal to give a similar instruction regarding mitigating evidence was not error in *People v. Breaux* (1991) 1 Cal.4th 281, 314-315, does not mean the prosecution has unconstitutionally received preferential treatment." (*People v. Moore*, *supra*, at p. 1140.)  Moreover, as in *Moore*, "there is no reasonable likelihood the jury in this case misunderstood the court's instruction to mean that the jury was required to be unanimous regarding mitigating factors.  Therefore, the absence of a nonunanimity instruction regarding mitigating evidence did not undermine defendant's constitutional rights." (*Ibid.*)

    *5.  Failure to instruct the jury that there is a presumption of life*

  We have repeatedly held that " '[t]he trial court's failure to [instruct] the jury that there is a presumption of life does not violate a defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protection of the law under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution.' " (*People v. Adams* (2014) 60 Cal.4th 541, 581; accord, *People v. Suff* (2014) 58 Cal.4th 1013, 1078; *People v. McKinnon* (2011) 52 Cal.4th 610, 698.)  Defendant fails to persuade us there is reason to reconsider our settled view.

    *6.  Asserted cumulative error*

  Defendant contends that the cumulative effect of the guilt and penalty phase errors requires reversal of the judgment.  We have concluded that defendant forfeited many of his claims of error.  In any event, we have either rejected the merits of defendant's claims or found that any error, assumed solely for purposes of argument, was harmless.  We now conclude there is no cumulative effect of error requiring reversal of the judgment. (*People v. Panah*, *supra*, 35 Cal.4th at pp. 479-480.)

### 7. *Intracase proportionality*

Intercase proportionality review is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution, but a defendant is entitled to *intracase* proportionality review under the California Constitution upon request. (*People v. Whalen* (2013) 56 Cal.4th 1, 91; *People v. Lenart* (2004) 32 Cal.4th 1107, 1130 [art. I, § 17 of the Cal. Const. entitles a requesting defendant to intracase proportionality review].) " ' " 'To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability" [citation], or, stated another way, that the punishment " ' "shocks the conscience and offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence as unconstitutional.' [Citation.]" ' " (*People v. Jackson* (2014) 58 Cal.4th 724, 771.)

Defendant contends that his death sentence is disproportionate punishment for his crimes because he was not a calculating killer, but merely reacted on the night of the crimes in an impulsive rage after he had been drinking and using drugs. He emphasizes (1) that he had little education, left home before he was 15 years old, and was poorly prepared to function as a husband and father as a teenager, (2) that he had severe neuropsychological impairments, and (3) that he is also still a member of the family, who will have to live with the consequences of his actions for the remainder of his life. We are unconvinced.

46

The record reflects that defendant lived with Bruni and her family on and off since he was a young teenager. To say he consistently abused Bruni's hospitality is an understatement. The record is replete with evidence that over the course of many years, he subjected his wife Clari, her brothers, and his daughter to violent assault and various kinds of mistreatment at Bruni's home, as well as elsewhere. He threatened and followed through with retaliation when he did not get his way. When Clari finally left him and took their children with her, the record reflects that defendant was angry and vengeful. He sought to harm Clari's family, including Bruni. On the night of the crimes, the record indicates defendant was not very drunk and only a little high. It also reflects that defendant planned and committed the murders through the use of a deliberate subterfuge. Defendant was solely responsible for the brutal killings of his mother-in-law and brother-in-law. He was 30 years old at the time and had a prior criminal record. The jury could have reasonably rejected defendant's evidence of mental impairments based on the rebuttal evidence that defendant had deliberately feigned his mental illness. These circumstances do not demonstrate that defendant's death sentence is grossly disproportionate to his personal culpability; it does not shock the conscience nor offend fundamental notions of human dignity.

### 8. *Defendant's challenges to California's death penalty scheme*

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme in order to urge reconsideration by this court of our previous rejection of them and to preserve the claims for federal review. Defendant fails to persuade us that reconsideration is required and we continue to reject the claims as follows. (*People v. Schmeck* (2005) 37 Cal.4th 240, 303-304.)

"Section 190.2 is not impermissibly overbroad in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Specifically, the various special circumstances are not so numerous as to fail to perform the constitutionally required narrowing function, and the special circumstances are not unduly expansive, either on their face or as interpreted by this court." (*People v. Jennings* (2010) 50 Cal.4th 616, 688; accord, *People v. Linton*, *supra*, 56 Cal.4th at p. 1214.)

"Section 190.3, factor (a), which allows the jury to consider the circumstances of the capital crime in aggravation, is not impermissibly overbroad and does not lead to arbitrary or capricious imposition of the death penalty." (*People v. Mai* (2013) 57 Cal.4th 986, 1057; accord, *People v. DeHoyos*, *supra*, 57 Cal.4th 79, 149.)

"The use of the words ' "extreme" ' in section 190.3, factors (d) and (g), and ' "substantial" ' in factor (g), does not act as a barrier to the consideration of mitigating evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments." (*People v. Linton*, *supra*, 56 Cal.4th at p. 1216.)

" '[T]he statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors.' " ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 766; accord, *People v. Linton*, *supra*, 56 Cal.4th at p. 1216.) "There is no constitutional requirement that the jury be instructed regarding which of the statutory factors in section 190.3 are aggravating, which are mitigating, and which could be either aggravating or mitigating." (*People v. Merriman* (2014) 60 Cal.4th 1, 106-107.)

California's death penalty law is not unconstitutional for failing to require proof beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate punishment. (*People v. Boyce* (2014) 59 Cal.4th 672, 723-724; *People v. DeHoyos*, *supra*, 57 Cal.4th at pp. 149-150.) The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466,

*Ring v. Arizona* (2002) 536 U.S. 584, and *Cunningham v. California* (2007) 549 U.S. 270 do not change this result. (*People v. Boyce, supra*, at p. 724; *People v. Loker* (2008) 44 Cal.4th 691, 755.)

The absence of written or other specific findings by the jury regarding aggravating factors did not violate defendant's rights under the Sixth, Eighth, and Fourteenth Amendment to meaningful appellate review, equal protection of the laws or right to jury trial. (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 150; *People v. Linton*, *supra*, 56 Cal.4th at p. 1216.)

"The federal Constitution is not violated by the failure to require a penalty phase jury to reach unanimity on the presence of aggravating factors." (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 150.)

The court was not required to instruct that the prosecution bears the burden of persuasion to establish that aggravating factors exist, that they outweigh mitigating factors, and that the death penalty is appropriate. (*People v. Boyce*, *supra*, 59 Cal.4th at p. 724; *People v. Clark* (2011) 52 Cal.4th 856, 1007-1008.) "Nor was the court required to articulate the converse, that there is no burden of proof at the penalty phase." (*People v. Boyce*, *supra*, at p. 724.) Defendant was not entitled to an instruction informing the jury that there is a presumption in favor of a sentence of life without parole. (*Ibid.*; *People v. Streeter*, *supra*, 54 Cal.4th at p. 268.)

California's death penalty law does not violate international law and norms or evolving standards of decency. (*People v. Kopatz, supra*, 61 Cal.4th at p. 96; *People v. Suff, supra*, 58 Cal.4th at p. 1079.)

### III. Conclusion

The judgment is affirmed.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Cage

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S120583
**Date Filed:** December 3, 2015

_____

**Court:** Superior
**County:** Riverside
**Judge:** Dennis A. McConaghy

_____

**Counsel:**

Susan K. Massey, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Susan K. Massey
9462 Winston Drive
Brentwood, TN  37027
(615) 661-0661

Theodore M. Cropley
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2286