Filed 8/18/21  P. v. Garcia CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL RAZO GARCIA,<br><br>    Defendant and Appellant. | F078383<br><br>(Kern Super. Ct. No. BF171258A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury found appellant Daniel Razo Garcia guilty of first degree murder for the 2018 shooting death of Raul Quintana (Pen. Code, § 187, subd. (a);[1] count 1). The jury found true that Quintana's murder was committed while appellant was engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)), and it also found true that appellant intentionally and personally discharged a firearm that caused Quintana's death (§ 12022.53, subd. (d)). Based on the true finding of the robbery-murder allegation, the trial court imposed a sentence of life in prison without the possibility of parole (LWOP).[2] In light of the LWOP sentence, the court elected to strike the firearm enhancement.

Appellant argues the trial court abused its discretion when it refused to dismiss a juror for alleged good cause. He also contends both his first degree murder verdict and the robbery-murder special circumstance finding must be reversed for insufficient evidence. Finally, he asserts evidentiary error occurred when the court permitted admission of some of his social media messages. We reject these claims and affirm.

## BACKGROUND

This homicide occurred in the evening of January 28, 2018, in an orchard near Wasco, California. It was undisputed at trial that appellant shot Quintana.[3] Appellant claimed he acted in self-defense after Quintana had attempted to rob him at gunpoint. Based on the verdict, it is clear the jury rejected appellant's version of events. We summarize the material trial evidence.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] The jury was unable to reach an agreement on a special circumstance allegation that this murder was committed by means of lying in wait. The trial court declared a mistrial regarding that allegation.

[3] Quintana's nickname was "Rito."

## I.     This Homicide was Related to a Drug Debt

Appellant, who was 18 years old when this crime occurred,[4] admitted to the jury he was a drug dealer who regularly sold cocaine and marijuana.  For a few months before this homicide, appellant had regularly sold cocaine to Quintana.  Appellant told the jury that Quintana was his friend.  The jury learned that Quintana also sold cocaine and marijuana.  Quintana was described at trial as a "low level street dealer."

Leading up to this killing, Quintana owed appellant $120 after failing to pay for an "eight ball" of cocaine he had received from appellant.[5]  On January 23, 2018, appellant sent Snapchat[6] messages to his friend "Geronimo"[7] complaining that Quintana had not paid him.  Appellant had learned a person named "Matt" was either selling drugs to or for Quintana.  Appellant wrote a Snapchat message to Geronimo that he was going to "set up" Matt.  Appellant told the jury he had planned to meet Matt and take cocaine from him in order to help offset the money that Quintana owed him.  Appellant, however, never met with Matt.  Appellant admitted at trial he was coming up with a plan to get the money back from Quintana.  Appellant told the jury he was "pretty convinced" Quintana was not going to pay him back.

Appellant messaged Geronimo that "shit is getting real" and Quintana had "jacked" an eight ball from me.  Appellant informed Geronimo that he (appellant) was "shaking the tree and I'm ready if he wants problems."  Appellant wrote that Quintana "did me dirty," and appellant was not going to wait for his money.  Appellant messaged

---

[4] Appellant was born in October 1999.

[5] The jury learned that an "eight ball" is an eighth of an ounce (3.5 grams) of cocaine.

[6] Snapchat is a multimedia messaging app that permits users to communicate with each other.

[7] This person was identified at trial only as "Geronimo" who had a username of "yoo_gmo" on Snapchat.  The court reporter sometimes spelled this name as "Giranamo."  We adopt the more traditional spelling of Geronimo.

3.

Geronimo that "[a]ctions speak louder than words." Appellant reassured Geronimo that he did not want to kill Quintana, but he wanted Quintana to take a loss. Appellant wrote that Quintana "slit my throat. I'm going to slit it." Appellant testified at trial that he gave Quintana respect, "and he should give me the same respect back." Appellant agreed at trial that respect was shown by paying drug debts promptly.

## II.     Appellant Arranges a Meeting with Quintana

On or about January 28, 2018, appellant arranged to meet Quintana to buy cocaine from him. In a series of messages, they agreed upon a purchase price, which included an offset for the amount of money Quintana owed appellant. The jury learned that appellant and Quintana had met previously at an orchard in the area of Scofield Avenue and McCombs Road near Wasco in order for Quintana to buy drugs from appellant.[8] They would "typically" meet at this location. Appellant told the jury he "usually" sold drugs to Quintana. He agreed it was "abnormal" for him to buy drugs from Quintana.

## III.    The Evidence was in Conflict regarding Where Appellant and Quintana Initially Met on the Fatal Night.

The jury heard conflicting testimony regarding where appellant initially met Quintana on the fatal night. According to appellant, he met Quintana near an orchard in the area of Scofield and McCombs.[9] He said he arrived first, and he waited for Quintana to arrive. Appellant testified that his friend, Frank Sandoval, was with him when he (appellant) met Quintana near the orchard. Appellant and Sandoval were in appellant's van.[10]

---

[8] Appellant also used this location to sell drugs to others.

[9] This homicide occurred in an orchard in the area of Scofield Avenue and McCombs Road near Wasco, California.

[10] The jury learned that Sandoval was often with appellant when appellant sold drugs.

4.

Appellant told the jury that Quintana's vehicle arrived about five minutes later, and Quintana exited the vehicle from the passenger side. Appellant got out of the van and they exchanged greetings. According to appellant, he met Quintana sometime between 10:30 p.m. and 11:00 p.m.

A witness at trial contradicted some of appellant's testimony. Alberto Andres testified he was the one who had dropped off Quintana on the fatal night.[11] According to Andres, Quintana received a call on his cell phone and Quintana then asked Andres to drop him off at Rose and Marvin Avenues. Andres testified that he dropped off Quintana near an apartment complex sometime around 9:00 p.m. It was Andres's understanding that Quintana was meeting a "Daniel."[12] Andres testified that he did not know this person, but he knew Quintana had previously conducted drug transactions with him.

Andres testified that, after he was dropped off, Quintana got into a van. At trial, Andres identified photographs that depicted the van he saw Quintana enter. The prosecution established that these photos portrayed appellant's van. Andres agreed at trial that Quintana was "not scared" to get into appellant's van that fatal night.

Andres told the jury that, before being dropped off, Quintana had told him that he should wait at a soccer field for him. Andres testified that, after he dropped off Quintana, he waited for Quintana at the soccer field.

Andres told the jury that, after Quintana got inside appellant's van near the apartment complex in Wasco, he saw the van drive away. He denied knowing where the van went.

## IV. Appellant's Trial Testimony About the Killing

At trial, appellant claimed he spoke with Quintana outside his van near the orchard while Sandoval waited in the van. Appellant claimed that, at some point, Quintana held a

---

[11] Andres testified under an immunity agreement.

[12] Appellant's first name is Daniel.

revolver[13] to appellant's head and Quintana demanded money. Appellant testified he was able to wrestle the gun away from Quintana, which fell to the ground and appellant retrieved it. According to appellant on direct examination, Quintana "[k]ind of started to run towards me and I shot him six times." Appellant told the jury he thought Quintana was going to kill him. Appellant testified that, after he fired at Quintana, he saw Quintana run into the orchard.[14]

Appellant told the jury that after he fired the handgun, Sandoval exited the van and asked him what had happened. Appellant claimed Sandoval "got mad," and he retrieved appellant's 12-gauge shotgun from the van. Appellant testified he told Sandoval to leave, but Sandoval approached Quintana, and appellant heard Sandoval fire the shotgun multiple times.

Appellant told the jury he never intended to kill Quintana. He claimed he acted in self-defense. He denied robbing Quintana or taking Quintana's property.[15]

On cross-examination appellant claimed that, after Quintana held the gun to his head, he wrestled with Quintana and the revolver fell to the ground. They both went for the gun, and appellant retrieved it. Appellant started "instantly shooting" from about four feet away. He claimed that Quintana was facing him the entire time for all six shots.

According to appellant, Quintana then turned and limped into the orchard. Quintana stood by a tree and appellant saw Quintana hanging on to it.[16] Sandoval

---

[13] At trial, appellant agreed that Quintana's revolver was consistent with a .38-caliber.

[14] Appellant claimed that the vehicle which had dropped off Quintana had remained in the area until shots were fired. According to appellant, this vehicle drove away just after he fired the shots.

[15] Appellant told the jury he was "not sure" if Sandoval had any of Quintana's property when they drove away from the orchard that night.

[16] Law enforcement discovered a gold necklace hanging loose and partially wrapped around a lower limb in the orchard at the crime scene. At trial, one of

retrieved the shotgun from the van and walked closer to Quintana. Appellant told Sandoval that they should leave, but Sandoval would not listen to him. Appellant saw Sandoval fire the shotgun once, and he heard another shot. He claimed he was only aware of two gunshots after Sandoval entered the orchard.[17]

Appellant admitted at trial that he drove away in possession of Quintana's handgun. According to appellant, the next morning after this killing he gave Quintana's handgun to Sandoval, who "got rid of it." Appellant told the prosecutor it was Sandoval who had loaded appellant's shotgun. According to appellant, Sandoval had loaded the shotgun around 7:00 p.m. earlier on the fatal day using shells ("buckshot and some other type") that appellant had provided.

Appellant testified he never alerted authorities about what happened because he had been scared. He told the jury he believed he would be arrested for murder and for selling drugs.

## V.     The Forensic Evidence

On the morning of January 29, 2018, the day after the shooting, Quintana's body was discovered by employees working for the company that farmed the orchard. Authorities were alerted.

Quintana was found lying on the ground on his back with his sweatshirt pulled up and his pants pulled down. A pocket had been slightly pulled out. He did not have his cell phone or wallet with him when authorities searched his body.[18] An Apple watch,

---

Quintana's friends confirmed that this gold chain had belonged to Quintana, and he normally wore it around his neck.

[17] This testimony differed from appellant's testimony on direct examination, wherein he indicated he heard Sandoval fire the shotgun as many as four times.

[18] The person who dropped off Quintana to meet appellant on the fatal night, Andres, testified that, earlier that day, Quintana had about $1,500 in cash, which he had placed in his wallet. Andres also testified that Quintana had an iPhone with him that day.

however, was discovered on his wrist, which was only spotted after an evidence technician pulled up a sleeve in order to better access Quintana's hand.[19] A small baggie of suspected narcotics was lying on the ground next to Quintana's body.

Based on the number of different indicators, law enforcement believed at least two perpetrators, and perhaps three, were involved in shooting Quintana. Law enforcement found evidence that both 12-gauge and 20-gauge shotgun shells had been fired at the crime scene. A bullet, likely .38-caliber and fired from a revolver, was also recovered.

A pathologist performed an autopsy on Quintana. Quintana had been shot eight times, and all shots were potentially lethal. The shots originated from a handgun and a shotgun. Quintana had no defensive wounds.

The pathologist determined that Quintana had been shot four times with a handgun that was consistent with a .38-caliber. Three of these wounds entered Quintana through the back of his body. Two such wounds penetrated the back of Quintana's right upper arm, and one such wound penetrated his left back. Only one handgun wound (overall wound number 2) penetrated Quintana's body from front-to-back. The pathologist found no sooting associated with any of the four wounds sustained from a handgun. The pathologist explained that "sooting" is the "smoke" that exits a firearm's barrel and gets deposited on the victim's skin around the entrance wound. Numerous variables – such as the target's distance, amount of gunpowder, and clothing on the victim – could impact whether sooting occurs. The pathologist opined that "by four feet" sooting would not be expected with a shot fired from a handgun.

Regarding the four shotgun wounds, at least one involved buckshot while the remaining three involved slugs. These four shots entered the right side of Quintana's

---

Quintana had "stuff" with him, including a satchel, when he met appellant. Quintana kept drugs in the satchel.

[19] The jury learned that when an Apple watch is in close proximity with an iPhone they synchronize.

body. The pathologist opined that the three slugs were consistent with a 12-gauge. At least three of the shotgun wounds had sooting. Those wounds (overall wound numbers three four and five) had been inflicted from slugs consistent with a 12-gauge. The pathologist testified he would be "surprised" to see "soot" from a shotgun greater than eight to 10 feet away.

The pathologist determined Quintana had numerous drugs in his system at the time of death, including a high amount of cocaine. He was intoxicated when this shooting occurred. The cause of death was homicide from multiple gunshot wounds.

## VI. Appellant is Arrested

Following interviews with various individuals, law enforcement identified appellant and Sandoval as suspects in this homicide. On February 13, 2018, law enforcement arrested appellant. A loaded 12-gauge shotgun was recovered from his van. Appellant's residence was searched that same day. Nothing belonging to Quintana was located in appellant's possession. Law enforcement never found Quintana's cell phone.

Testing later confirmed that three of the four shotgun shells recovered at the crime scene were fired from the shotgun recovered in appellant's van. It was inconclusive whether appellant's shotgun fired the fourth recovered shell.[20]

## VII. Appellant Lies to Detectives

On February 13, 2018, detectives interviewed appellant about this homicide. That interview was recorded and played for the jury. During the interview, appellant repeatedly lied to the detectives. He denied being with Sandoval on the night of this killing, and appellant claimed he had been home that night. Appellant repeatedly denied having any knowledge about Quintana's death or being involved in this shooting. He gave the detectives a name of someone, a person Quintana allegedly owed money, who

---

[20] At trial, appellant told the jury he did not dispute that the 12-gauge shells found at the crime scene were fired from his shotgun.

9.

might be responsible for this homicide. Appellant initially denied to detectives that he had ever communicated with Quintana, but appellant eventually admitted he had texted with Quintana on Snapchat. Appellant denied that Quintana owed him money, but he later acknowledged that Quintana owed him $100. Appellant claimed he had loaned Quintana that money after Quintana had been evicted by his mother. Appellant denied that Quintana had pulled a gun on him. He denied meeting Quintana in the orchard.[21]

At trial, appellant admitted he had lied repeatedly during his interview with detectives. He told the jury he had been scared to tell the truth because he believed the detectives would just use his statements against him.

## DISCUSSION

### I. The Trial Court did not Abuse its Discretion When it Declined to Excuse a Juror for Alleged Good Cause

Appellant asserts that the trial court abused its discretion when it failed to excuse a juror for alleged good cause. He seeks reversal of his judgment.

#### A. *Background*

On the first day of jury deliberations, the trial court learned that juror number 10 had previously shared the same last name (Porcho) as the courtroom bailiff. The court asked the juror if she was related to the deputy. She said, "I believe I am." However, she did not know how they were related. The juror disclosed she had asked the bailiff about his last name, and she had informed him that it was her maiden name.

The court disclosed that the bailiff did not think he was related to juror number 10. The juror then explained that, when she spoke with the bailiff, he had informed her that he had known that someone in her family had died. She had told him it was her grandfather. The bailiff said he did not go to the funeral and he did not know "that side

---

[21] Following appellant's arraignment on February 15, 2018, he called his mother from jail. His conversation was recorded and played for the jury. Appellant indicated to his mother that he had acted in self-defense.

of the family." The bailiff had never met the juror's grandfather. The juror informed the court that she had approached the bailiff "because his last name is Porcho and it's a very rare last name." The juror explained she had this conversation with the bailiff "probably two weeks ago." She had already been selected as a juror when the conversation occurred. The court asked if she thought "there might be some relationship between" her and the bailiff. She replied, "Honestly, I have no idea. I don't know."

The court asked if her belief of a possible relationship with the bailiff would impact her ability to be a fair juror. She stated, "No, it wouldn't impact it at all." The court asked why she had not disclosed her conversation with the bailiff. She answered, "You know, honestly, I should have probably said something, but I didn't think – [¶] [b]ecause I've never met him and I don't know him." The court told her it was "fine" and she was excused.

The trial court spoke with the attorneys. The court reiterated the bailiff had denied knowing he was related to juror number 10. Appellant's trial counsel moved to dismiss this juror, contending she should have disclosed this information during voir dire. According to defense counsel, this was an issue of dishonesty because she did not bring her possible relationship with the bailiff to the court's attention even though she deemed it important enough to ask the bailiff.

The prosecutor argued against excusing juror number 10, maintaining she had been "forthcoming." Defense counsel responded that the juror had not been forthcoming because she had failed to bring this matter to the court's attention. Defense counsel noted that this issue only came to light because the defense had learned toward the end of trial that the juror's maiden name was Porcho.

The trial court acknowledged it had referred to the bailiff as "Deputy Porcho" throughout the trial, which alerted all jurors about his last name. However, the court did not believe juror number 10 had been dishonest during voir dire. The court was not certain when the bailiff had been introduced to the jury panel. However, the court noted

11.

that members of the jury panel had been asked if they "have any close friends or close relatives in law enforcement" and that did not appear to be applicable in this situation. The court did not believe the juror had done anything that required her dismissal from the panel. The court concluded that nothing showed the juror's ability to be fair in deciding this matter had been impacted. The court denied the motion.

## B.    *Standard of Review*

An abuse of discretion standard is used to review a trial court's decision whether to discharge a juror. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.) An appellate court will uphold such a ruling if any substantial evidence supports it. (*Ibid.*) Our high court holds that "a juror's inability to perform as a juror " 'must appear in the record as a demonstrable reality.' " [Citation.]' [Citation.]" (*Ibid.*)

## C.    *Analysis*

According to appellant, reversal of his judgment is required because he was "convicted by a jury that included a person who could not reasonably be expected to serve as an impartial, indifferent juror." He notes that many of the prosecution's witnesses were sheriff's deputies. He contends there can be "no confidence" he received a fair trial. He maintains the juror's failure to disclose her possible relationship to the bailiff, or her conversation with him, shows she was untrustworthy. Finally, appellant maintains that substantial evidence does not support the court's decision. According to appellant, the juror's own assurance that she would remain impartial could not provide substantial evidence to support the court's decision because she only disclosed what occurred after the court summoned and questioned her. Appellant insists that the juror's explanations lacked credibility. He contends we must find an abuse of discretion and reverse his judgment. We disagree.

Section 1089 authorizes a trial court to discharge a juror and substitute an alternate if "good cause" is shown that the juror is "unable to perform his or her duty[.]" A juror

12.

may be excused for actual bias, which is "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C); *People v. Ledesma* (2006) 39 Cal.4th 641, 670.)

In this matter, nothing demonstrates or reasonably suggests juror number 10 was biased or she was unable to perform her duty in a fair and impartial manner. The bailiff denied being related to juror number 10 and he did not know her family. Juror number 10 initially told the court she believed she was related to the bailiff, but she later stated she did not know.

Nothing demonstrates that juror number 10 had any meaningful relationship with the bailiff. Nothing reasonably suggests the juror was biased or untrustworthy. Juror number 10 explained what happened, and her explanations appear reasonable. We reject appellant's assertion that she lacked credibility.

The court issued its ruling after thoughtfully considering the situation, and substantial evidence supports the decision. The juror's alleged inability to perform as a juror does not appear in this record as a demonstrable reality. (See *People v. Cleveland, supra,* 25 Cal.4th at p. 474.) The court acted well within its discretion in denying the motion to remove her, and an abuse of discretion is not present. Therefore, we reject appellant's arguments, and this claim fails.

## II.     Substantial Evidence Supports the Conviction for First Degree Murder

Appellant contends his conviction for first degree murder must be reversed for insufficient evidence.

### A.     *Background*

The trial court instructed the jury that appellant could be guilty of first degree murder based on three alternative theories: (1) willful premeditation and deliberation;

13.

(2) lying in wait; and (3) felony murder in the commission of a robbery. Regarding liability for felony murder, the jury was told appellant must have (1) committed robbery; (2) intended to commit robbery; and (3) while committing robbery, he caused the death of another person.[22] The court provided the jury with the elements necessary to establish robbery.

The prosecutor argued to the jury that all three theories supporting first degree murder had been proven. The jury found appellant guilty of first degree murder, but it did not specify which theory it used. However, the jury found true a robbery-murder special-circumstance allegation. In contrast, it returned no finding on a lying-in-wait special circumstance allegation.

### B.    *Standard of Review*

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.) The standard of review is the same in which a conviction is based primarily on circumstantial evidence. (*People v. Clark* (2016) 63 Cal.4th 522, 625.)

---

**22** The jury was also instructed regarding liability under a theory of aiding and abetting.

## C.    *Analysis*

Appellant asserts that, although his Snapchat messages show "he was clearly irritated" that Quintana had failed to pay his debt, nothing shows he intended to rob or kill Quintana.  Appellant maintains insufficient evidence supports all three theories used to establish first degree murder.  First, he contends nothing demonstrates this killing was willfully premeditated and deliberate.  Second, he argues there is insufficient evidence of lying in wait.  Finally, he claims felony murder was not established because there is no evidence that he held an intent to steal prior to firing the fatal gunshots, and the evidence does not prove he stole any of Quintana's money or possessions.

Before we turn to appellant's arguments, we again note that the jury did not disclose the theory it relied on in convicting appellant of first degree murder.  The jury, however, was permitted to convict appellant without making a unanimous choice of one of several theories proposed by the prosecution.[23]  (See *People v. Jennings* (2010) 50 Cal.4th 616, 639; *People v. Friend* (2009) 47 Cal.4th 1, 54.)  Although premeditated murder and felony murder "have different elements, only a single statutory offense of murder exists.  Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded.  [Citations.]"  (*People v. Nakahara* (2003) 30 Cal.4th 705, 712.)

In this matter, we reject appellant's arguments.  We conclude the first degree murder verdict is supported with substantial evidence for all three theories.

### 1.    Substantial evidence demonstrates appellant's willful premeditation and deliberation

A murder that is perpetrated by a "willful, deliberate, and premeditated killing" is classified as murder of the first degree.  (§ 189, subd. (a).)  In *People v. Anderson* (1968)

---

[23] During closing argument, the prosecutor informed the jurors that they did not need to agree on which theory supported first degree murder.  The prosecutor stated, "You can find one of them, two of them or three of them with your individual votes to be true."

70 Cal.2d 15 (*Anderson*), our high court set forth the types of evidence sufficient to sustain a finding of premeditation and deliberation. The *Anderson* court divided the evidence into the following three categories:

(1) Facts about what the defendant did before the actual killing showing that the defendant was engaged in activity directed toward, and intended to result in, the killing (the " 'planning activity' "). (*Anderson, supra,* 70 Cal.2d at pp. 26–27.)

(2) Facts about the defendant's prior relationship or conduct (or both) with the victim from which the jury could reasonably infer a motive to kill the victim. The high court stated that an inference of motive, together with facts of planning activity or the nature of the killing (discussed next) would, in turn, support an inference that the killing resulted from a " 'pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]…." (*Anderson, supra,* 70 Cal.2d at p. 27.)

(3) Facts about the nature of the killing from which the jury could infer that the manner of killing was so particular that the defendant must have acted on a preconceived design to kill in a particular way for a reason that the jury can reasonably infer from facts of type (1) or (2). (*Anderson, supra,* 70 Cal.2d at p. 27.)

Our high court typically sustains verdicts of first degree murder when there is evidence of all three types above. (*Anderson, supra,* 70 Cal.2d at p. 27.) In the alternative, it requires at least extremely strong evidence of planning activity or evidence of motive in conjunction with either planning activity or the manner of killing. (*Ibid*.)

Our Supreme Court has cautioned that the *Anderson* factors are merely a guide to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) The *Anderson* factors are "not exclusive" or "invariably determinative." (*People v. Combs* (2004) 34 Cal.4th 821, 850.)

With the *Anderson* factors as a guide, we examine the record for substantial evidence of premeditation and deliberation.

### a. *Planning Activity*

Appellant argues that, based on his social media messages, his activity prior to the killing "appears to have been oriented not toward making plans to kill Quintana but toward trying to settle a debt." He also claims nothing shows he "devised a plan to avoid detection or capture after the killing." He concludes the evidence suggests he "had no preexisting plan whatsoever." We disagree.

The evidence was in dispute regarding where appellant initially met Quintana on the fatal night. The jury was entitled to credit Andres's testimony in this regard and reject appellant's testimony. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162 [jury holds exclusive province to determine witness credibility and the facts].) Based on Andres's testimony, Quintana met appellant near an apartment complex on the fatal night and Quintana got into appellant's van, which drove away. Quintana's body was found the next morning in an orchard in the area of Scofield Avenue and McCombs Road.

Appellant arranged to meet Quintana to buy drugs from him. Appellant, however, testified it was unusual for him to buy drugs from Quintana. Instead, appellant typically sold drugs to Quintana. The jury could have reasonably concluded that appellant arranged the drug meeting not to purchase drugs from Quintana but to get Quintana alone inside his van. The jury could have also reasonably determined that, had appellant intended a drug sale to occur, that transaction could have taken place inside the van without the need to drive to the orchard. The evidence reasonably suggests appellant arranged to meet Quintana so that he and Sandoval could drive Quintana to a desolate area where the killing could occur.

Moreover, appellant told the prosecutor that Sandoval loaded appellant's shotgun around 7:00 p.m. before they met Quintana. Sandoval loaded the firearm using shells

("buckshot and some other type") that appellant had provided. From all of the evidence, the jury had grounds to determine that appellant and Sandoval were planning to commit this killing.

Finally, appellant testified at trial that, after this killing, he gave Quintana's handgun to Sandoval, who "got rid of it." Appellant also lied repeatedly to detectives about his involvement in this killing. Appellant took steps to conceal his involvement in this crime.

Although appellant can point to an alternative view of how to interpret his social media messages, his explanation is not the only possible inference that may be drawn. An opposing interpretation of fact is insufficient to reverse the judgment. Instead, we must presume every inference in support of the judgment that the jury could reasonably have made, and we will not reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy, supra,* 48 Cal.4th at p. 293.)

Based on the facts from this record, the jury had sufficient evidence to find that appellant planned to kill Quintana.

### b. *Motive*

Appellant asserts nothing shows he "had a significant motive" to kill Quintana. However, our Supreme Court holds that "a specific motive" need not be established in order for a reviewing court to affirm a judgment, even one involving first degree murder. (*People v. Edwards* (1991) 54 Cal.3d 787, 814.) Even a "senseless, random, but premeditated, killing supports a verdict of first degree murder." (*Ibid.*)

Here, a motive to kill overwhelmingly exists. It was undisputed at trial that Quintana owed appellant money for a prior drug transaction. Appellant expressed his clear frustration that Quintana was not paying him back. Although appellant reassured Geronimo in a message that he did not want to kill Quintana the jury was not required to accept that statement as excluding a motive to kill. Instead, the jury was free to conclude

that, as a drug dealer, appellant felt the need to send a message for Quintana's lack of respect. Based on the owed debt and appellant's clear frustration with Quintana, a motive to kill can be readily inferred from the record.[24]

### c. *The Manner of the Killing*

The manner of killing strongly suggests premeditation and deliberation. Quintana was shot eight times, and all shots were potentially lethal. The shots originated from a handgun and a shotgun. Quintana had no defensive wounds.

The forensic evidence contradicts appellant's claim of self-defense. Only one handgun wound entered Quintana from front-to-back. That wound (overall wound number two) entered Quintana's chest and exited through the back near his shoulder blade. The remaining three handgun wounds all struck Quintana from back-to-front. The pathologist found no sooting associated with any of the four wounds sustained from a handgun.

Because a majority of the .38-caliber handgun shots struck Quintana's on his back side, the forensic evidence strongly suggests Quintana was attempting to flee from appellant when appellant fired. Moreover, the lack of sooting from these wounds provides an inference that appellant shot Quintana at a distance of four feet or more.[25] Besides belying appellant's claim of self-defense, this evidence establishes a reasonable inference that appellant fired the handgun in a willful, deliberate and premeditated way.

Moreover, Quintana was shot an additional four times from at least one shotgun. One shotgun wound was caused by buckshot while the remaining three involved slugs. These four shots entered the right side of Quintana's body. At least three of the shotgun

---

[24] As we discuss later in this opinion, substantial evidence supports the jury's true finding on the robbery-murder special circumstance allegation (§ 190.2, subd. (a)(17)(A)). The jury had substantial evidence to find both an intent to kill and an intent to rob.

[25] The pathologist opined that "by four feet" sooting would not be expected with a shot fired from a handgun.

wounds had sooting, which suggests the shots were fired closer than eight to 10 feet away.

In light of the forensic evidence, coupled with Andres's testimony that Quintana had entered appellant's van and was driven to the orchard, the manner of Quintana's killing appears "so particular and exacting" that an inference exists appellant must have intentionally killed according to a preconceived design to take Quintana's life. (*Anderson, supra,* 70 Cal.2d at p. 27.)

When the *Anderson* factors are considered, substantial evidence supports the jury's first degree murder verdict. This record demonstrates (1) some planning activity; (2) a clear motive; and (3) a manner of killing that strongly suggests premeditation and deliberation. Under these circumstances, it is appropriate to sustain the jury's first degree murder conviction because "there exists evidence of a motive to kill, coupled with evidence of either planning activity or a manner of killing which indicates a preconceived design to kill. [Citation.]" (*People v. Edwards*, *supra*, 54 Cal.3d at pp. 813–814; see also *People v. Lucero* (1988) 44 Cal.3d 1006, 1018 [although no single *Anderson* factor was particularly strong, at least some evidence was presented on each and evidence was sufficient when considered in combination].)

Based on this record, the jury had substantial evidence to find appellant guilty beyond a reasonable doubt of first degree murder based on a theory of premeditation and deliberation. This evidence was reasonable, credible and of solid value. Accordingly, the jury had a valid ground to find appellant guilty, and reversal is not warranted. In any event, and as we discuss below, substantial evidence also supports first degree murder based on a theory of felony murder.

### 2. Substantial Evidence Demonstrates Felony Murder

All murder committed in the perpetration (or attempt) of certain enumerated felonies, including robbery, is murder of the first degree. (§ 189, subd. (a); *People v.*

20.

*Gutierrez* (2002) 28 Cal.4th 1083, 1140.) The mental state required for felony murder is the specific intent to commit the underlying felony, and evidence must demonstrate the defendant held a felonious intent either prior to or during the commission of the acts which resulted in the victim's death. (*People v. Brooks* (2017) 3 Cal.5th 1, 61.) First degree felony murder does not require proof of a strict causal or temporal relationship between the underlying felony and the killing. Instead, the killing and the felony must be part of one continuous transaction. (*Id.* at pp. 61–62.) The killing need not occur during the commission of the underlying felony so long as the felony is not merely incidental to, or an afterthought to, the killing. (*People v. Proctor* (1992) 4 Cal.4th 499, 532.)

In the present matter, it is undisputed Quintana owed appellant $120 after failing to pay for an "eight ball" of cocaine he had received from appellant. On January 23, 2018, appellant sent messages to his friend Geronimo complaining that Quintana had not paid him. Appellant testified at trial he had learned a person named "Matt" was either selling drugs to or for Quintana. Appellant wrote Geronimo that he was going to "set up" Matt. Appellant admitted to the jury he planned to take cocaine from Matt to help offset the money Quintana owed him. Appellant, however, never met Matt. Appellant admitted at trial he was coming up with a plan to get the money back from Quintana. Appellant told the jury he was "pretty convinced" Quintana was not going to pay him back. Appellant testified at trial he gave Quintana respect "and he should give me the same respect back." Appellant agreed at trial that respect was shown by paying drug debts promptly.

Appellant wrote that "shit is getting real" and Quintana had "jacked" an eight ball from me. Appellant wrote to Geronimo that Quintana "did me dirty," and appellant was not going to wait for his money. Appellant wrote that "[a]ctions speak louder than words." Appellant reassured Geronimo that he did not want to kill Quintana, but he wanted Quintana to take a loss. Appellant wrote that Quintana "slit my throat. I'm going to slit it."

21.

The jury was entitled to draw reasonable inferences from the circumstantial evidence. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166.) A reasonable inference exists from appellant's text messages that he held an intent to take property from Quintana when he arranged to meet Quintana. Appellant made it clear he intended to get his money back. In addition, appellant testified at trial about a lack of respect from Quintana, that he wanted Quintana to take a loss, and he was willing to take cocaine from Matt in order to get even with Quintana. The jury could have reasonably concluded appellant held an intent to rob Quintana prior to the killing.

Appellant's intent to rob may also inferred from Andres's testimony. The jury was entitled to credit Andres's testimony that Quintana met appellant near an apartment complex on the fatal night and Quintana got into appellant's van, which drove away. Based on Andres's testimony, the jury could have reasonably concluded that appellant arranged the drug meeting not to purchase drugs from Quintana (which appellant admitted at trial was unusual) but to get Quintana alone inside his van. Instead of completing a drug transaction and allowing Quintana to leave, appellant and Sandoval drove Quintana to the orchard where Quintana was shot multiple times and his clothing was searched. Other than Quintana's watch, which was initially hidden underneath the sleeve of his sweatshirt, law enforcement never found Quintana's belongings.

Moreover, appellant repeatedly lied to detectives about his involvement in this murder. At trial, however, he claimed it was Quintana who had threatened him with a handgun, and appellant claimed he had wrestled the gun away from Quintana and then fired it six times. The jury clearly found appellant's testimony lacking in credibility, and it rejected his assertion of self-defense. In light of the totality of the evidence, the jury had ample grounds to conclude appellant had held a specific intent to rob Quintana when he arranged to meet him. Our Supreme Court holds that a verdict may not be disturbed on appeal when the evidence justifies a reasonable inference of felonious intent. (*People v. Holt* (1997) 15 Cal.4th 619, 670; *People v. Cain* (1995) 10 Cal.4th 1, 47.)

22.

Finally, although none of Quintana's property was found in appellant's possession after this murder, appellant testified he took and kept Quintana's handgun. According to appellant, the morning after this killing he gave Quintana's handgun to Sandoval, who "got rid of it." In addition, the circumstantial evidence strongly suggests Quintana's clothing had been searched. He was found lying on the ground with his sweatshirt pulled up and his pants pulled down. One pocket had been slightly pulled out. Quintana's cell phone and wallet were missing. The reasonable inferences drawn from the evidence demonstrate appellant took property belonging to Quintana through the use of force or fear.

Viewing the record in the light most favorable to the judgment, substantial evidence exists from which a reasonable jury could have convicted appellant beyond a reasonable doubt of first degree murder based on a theory of felony murder. The evidence was reasonable, credible and of solid value that appellant had held an intent to rob Quintana before this killing occurred, and appellant took Quintana's property through force or fear. The circumstances demonstrate that appellant's robbery of Quintana was part of one continuous transaction with this killing. A reasonable inference exists that Quintana's robbery was not merely incidental to, or an afterthought to, the killing. As such, substantial evidence supports the conviction in count 1. In any event, and as we discuss below, substantial evidence also supports first degree murder based on a theory of lying in wait.

### 3. Substantial Evidence Demonstrates Lying in Wait

The jury made no finding on the lying-in-wait special circumstance allegation. However, during closing argument, the prosecutor informed the jurors that they did not need to agree on which theory supported first degree murder. The prosecutor stated the jurors could base the first degree murder conviction on one, two or all three of the theories. Thus, although it is remote, a possibility exists the jury may have based the

23.

guilty verdict on a theory of lying in wait and, for whatever reason, failed to address the special circumstance allegation. We conclude that, if the jury did rely on this theory to find appellant guilty of first degree murder, substantial evidence supports it.

All murder perpetrated by means of lying in wait is murder of the first degree. (§ 189, subd. (a); *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) First degree murder by lying in wait requires "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage …." (*People v. Morales* (1989) 48 Cal.3d 527, 557 (*Morales*), overruled on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459; see also *People v. Poindexter* (2006) 144 Cal.App.4th 572, 584–585 (*Poindexter*) [holding that these elements are required for both first degree murder by means of lying in wait and the lying-in-wait special circumstance].)

According to our Supreme Court, lying in wait does not require physical concealment. Instead, "[i]t suffices if the defendant's purpose and intent are concealed by his actions or conduct, and the concealment of purpose puts the defendant in a position of advantage, from which the fact finder may infer that lying in wait was part of the defendant's plan to take the victim by surprise. [Citations.]" (*People v. Ceja, supra,* 4 Cal.4th at p. 1140.)

Two opinions are instructive: (1) *People v. Cage* (2015) 62 Cal.4th 256 (*Cage*) and (2) *Poindexter, supra,* 144 Cal.App.4th 572.

### a. *Cage*

In *Cage*, the defendant hid a shotgun in a laundry basket and took that with him to the first victim's door. (*Cage, supra,* 62 Cal.4th at p. 279.) The high court held that a jury could rationally deduce from these facts that the defendant "planned and undertook a deliberate subterfuge aimed at making his presence appear to be an innocuous offer" to return clothes or request to do laundry so that the first victim "would open the door and admit him. The ruse disguised his intent to kill." (*Ibid.*) The high court also held that

24.

"[t]he lying in wait need not continue for any particular period of time provided that its duration is substantial in the sense that it shows a state of mind equivalent to premeditation or deliberation. [Citation.]" (*Ibid.*)

The *Cage* court addressed whether a "substantial period of watching and waiting" occurred to support a theory of lying in wait. (*Cage, supra,* 62 Cal.4th at p. 279.) It held that the evidence did not establish the specific length of time the defendant waited for the first victim to open the front door, but nothing in the record suggested "it happened instantaneously" upon the defendant's arrival at the house. (*Ibid.*, fn. omitted.) According to the high court, "[a] rational jury could infer that there was some period of watching and waiting at the door." (*Ibid.*) In addition, although the record did not establish how long the defendant interacted with the first victim before shooting, a neighbor testified that the first victim's dog "barked briefly around 10:30 or 10:45 p.m. and that shots were fired several minutes later." (*Ibid.*) According to the court, this testimony "could support an inference" the defendant conversed with the first victim "for a few minutes before removing the gun from the basket and shooting her. During such time defendant could have reflected on his intentions, such that his subsequent actions in taking the shotgun out of its hiding place and shooting [the first victim] and then proceeding upstairs to [the second victim's] room were not the product of a rash impulse. [Citation.]" (*Ibid.*)

Finally, the *Cage* court concluded the defendant's "surprise attack" on the victims "followed in a continuous flow of events" after the defendant used his successful "ruse" to persuade the first victim to open her front door. (*Cage, supra,* 62 Cal.4th at p. 280.) Our high court stated, "The jury could reasonably determine that defendant's actions met the requirement of an immediate surprise attack on unsuspecting victims from a position of advantage. [Citation.]" (*Ibid.*)

25.

**b.**      *Poindexter*

In *Poindexter*, the defendant and the victim had a verbal exchange in the presence of witnesses. The defendant told the victim words to the effect that " 'if you want to keep living … stay here.' " (*Poindexter, supra,* 144 Cal.App.4th at p. 575, fn. omitted.) A witness heard the defendant say he would " 'show' " the victim " 'what I mean.' " (*Ibid.*) The defendant walked away. Within a minute, he returned with a shotgun. He carried the shotgun pointed down, and he said something to the victim, who responded, " 'It's not that serious. It's not that serious.' " The defendant shot the victim three times before running away. (*Ibid.*)

On appeal, the defendant asserted the evidence was insufficient to support the jury's finding of first degree murder based on a theory of lying in wait. (*Poindexter, supra,* 144 Cal.App.4th at p. 577.) The appellate court disagreed and affirmed the judgment. (*Id.* at p. 589.) The *Poindexter* court held a reasonable jury could have concluded the defendant's statement to the victim, telling him to stay there if he wanted to live, "was a subterfuge intended to convince the victim to stay put" so the defendant could go and get his shotgun and kill him. (*Id.* at p. 586.) This fact supported "the element of concealment of purpose." (*Ibid.*) According to the appellate court, the evidence also supported a finding that the lying in wait "was for a sufficient period of time" because "it was sufficient to show a state of mind consistent with premeditation or deliberation." (*Ibid.*, fn. omitted.)

Appellant contends that *Poindexter* is distinguishable. According to appellant, no evidence could justify a conclusion he "met up with Quintana, or drove Quintana to the orchard, but concealed from Quintana a pre-existing intent to attack him at some point during their encounter." Appellant further contends no evidence suggests how much time elapsed from the moment he and Quintana "got together" and the time Quintana was shot. Appellant maintains no evidence supports an inference that he killed Quintana

26.

following a period of time during which he "waited for an opportune time to act." He concludes that evidence of lying in wait is insufficient. We disagree.

In the present matter, and similar to *Cage* and *Poindexter*, the jury could have reasonably deduced that appellant used a ruse and subterfuge to get Quintana into his van by setting up a drug transaction with the intent to rob and murder him. Andres agreed at trial that Quintana was "not scared" to get into appellant's van that fatal night. This suggests Quintana trusted appellant. A reasonable jury could have found that appellant took advantage of that trust.

The jury could reasonably conclude appellant concealed his true intent and purpose from Quintana. By having Quintana enter his van, appellant and Sandoval were able to drive him to the orchard where the murder occurred. Under these circumstances, driving Quintana to the orchard would show "a state of mind equivalent to premeditation or deliberation. [Citation.]" (*Cage, supra,* 62 Cal.4th at p. 279.)

The forensic evidence strongly suggests Quintana was fleeing from appellant when appellant shot him with the handgun. Three of those wounds entered Quintana from back-to-front. Quintana was shot an additional four times from at least one shotgun, and he had no defensive wounds. Based on the forensic evidence, a rational jury could have determined that appellant surprised Quintana and attacked an unsuspecting victim once they reached the orchard.

Viewing the record in the light most favorable to the judgment, substantial evidence supports first degree murder by means of lying in wait. The jury could have reasonably found "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage .…" (*Morales, supra,* 48 Cal.3d at p. 557.) This evidence was reasonable, credible and of solid value. Consequently, if the jury relied on this theory in count 1 despite rendering no finding on the special circumstance allegation, substantial evidence supports the murder verdict.

27.

Regardless of whether the jury based appellant's conviction of first degree murder on a theory of (1) premeditation and deliberation, (2) felony murder, or (3) lying in wait, substantial evidence supports the guilty verdict in count 1. Accordingly, appellant's arguments are without merit and it is not appropriate to reverse his judgment.

### III. Substantial Evidence Supports the Jury's True Finding on the Robbery-Murder Special Circumstance Allegation

Appellant received LWOP based on the jury's true finding for the robbery-murder special circumstance allegation (§ 190.2, subd. (a)(17)(A)). He argues this true finding must be reversed. He contends no evidence establishes he had an intent to steal anything from Quintana prior to the killing or that he stole Quintana's property. He notes that a felony-murder special circumstance allegation does not apply if the underlying felony was merely incidental to the murder. Further, he notes this special circumstance does not apply unless he formed the intent to steal before or while killing the victim.

Appellant maintains this record only discloses he had hoped to settle a debt with Quintana, and it does not establish his intent to rob and kill Quintana. Appellant notes that he messaged Geronimo indicating he wanted Quintana to take a loss and that he did not intend to kill Quintana. Appellant acknowledges that his messages to Geronimo suggest he intended "to confront Quintana and demand his money back," but he argues his message "cannot establish an intent to rob and kill." He asserts that the prosecution presented no eyewitness testimony concerning the sequence of events surrounding the killing. Thus, "no evidence establishes that the killing was predicated on the commission of a robbery."

Finally, appellant notes that he was never found in possession of Quintana's property. He argues there is no evidence that he or anyone stole Quintana's watch, wallet, money, or gun before or after the killing. He maintains nothing establishes Quintana had any property with him (except for his handgun) at the time he met appellant

28.

in the orchard. He concludes that the special circumstance finding must be reversed, and his sentence stricken. We disagree. Substantial evidence supports the jury's true finding.

"A jury's true finding on a special circumstance allegation must be supported by substantial evidence. [Citation.]" (*People v. Boyce* (2014) 59 Cal.4th 672, 691.) In conducting this review, a court examines the entire record in the light most favorable to the judgment below. (*Ibid.*) The issue is whether the record " 'discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the [special circumstance allegation true] beyond a reasonable doubt.' [Citations.]" (*Ibid.*)

" ' "[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." [Citations.]' [Citation.] '[A] jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was "primary," but instead the jury need only determine whether commission of the underlying felony was or was not merely incidental to the murder.' [Citation.] '[A] "concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance." [Citation.]' [Citation.]" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1326–1327.)

In large part, we have already rejected appellant's arguments in analyzing whether substantial evidence existed to support first degree murder based on a theory of felony murder. Although appellant can point to other interpretations that may be drawn from this record, the evidence supports a reasonable inference appellant held an intent to rob Quintana before this murder occurred. In addition, the jury had substantial evidence to find both an intent to kill and an intent to rob. Appellant's messages show he intended to get his money back from Quintana. Appellant testified at trial about a lack of respect from Quintana, that he wanted Quintana to take a loss, and he was willing to take cocaine

29.

from Matt in order to get even with Quintana. The record establishes a clear motive for appellant to both rob and kill Quintana. The jury could have reasonably concluded appellant held an intent to rob Quintana prior to the killing, and he concurrently intended Quintana's death.

Appellant's intent to rob may also inferred from Andres's testimony. The jury was entitled to credit Andres's testimony that Quintana met appellant near an apartment complex on the fatal night and Quintana got into appellant's van, which drove away. Based on Andres's testimony, the jury could have reasonably concluded that appellant arranged the drug meeting not to purchase drugs from Quintana (which appellant admitted at trial was unusual) but to get Quintana alone inside his van in order to effectuate a robbery.

Finally, appellant admitted at trial that he kept Quintana's handgun, and the circumstantial evidence strongly suggested Quintana's clothing had been searched. Other than Quintana's watch, which was initially hidden underneath the sleeve of his sweatshirt, law enforcement never found Quintana's property. The jury was free to draw the reasonable conclusion that appellant took Quintana's property through force or fear, and he intended to do so before this killing happened.

Viewing the record in the light most favorable to the judgment, substantial evidence exists from which a reasonable jury could have found true the robbery-murder special circumstance allegation (§ 190.2, subd. (a)(17)(A)). The evidence was reasonable, credible and of solid value that appellant held an intent to rob Quintana before this killing occurred, and appellant took Quintana's property through force or fear. The jury could have reasonably concluded appellant held a concurrent intent to rob and to kill. As such, substantial evidence supports the jury's determination. Accordingly, appellant's arguments are without merit, and we will not reverse the special circumstance finding.

30.

**IV.    The Trial Court did not Abuse its Discretion in Permitting Introduction of Appellant's Snapchat Messages**

According to appellant, the trial court abused its discretion in permitting introduction of his Snapchat messages. He contends these messages were never properly authenticated, and he seeks reversal of his judgment.

**A.    *Background***

Prior to the start of this trial, appellant's defense counsel filed a motion in limine seeking to exclude Snapchat and Facebook[26] records that the prosecution claimed belonged to appellant. The defense argued authentication was required to establish that appellant actually wrote the messages or posted the content.

An evidentiary hearing occurred regarding this motion. A detective, Daniel Perez, testified that during his investigation he learned appellant had Facebook and Snapchat accounts. Appellant was known as "waffles_1999" on Snapchat. Because these accounts were password protected, Perez needed to obtain warrants. Using subpoenas, Perez obtained records purportedly belonging to appellant from both Facebook and Snapchat. Perez accessed appellant's Snapchat account, which included a photo of appellant and a photo of a shotgun which looked similar to appellant's shotgun seized in this matter. Perez found text messages between appellant and Quintana, who had a Snapchat name of "Chiefrito." Based on the text messages, it appeared appellant and Quintana had arranged a drug deal. Another text conversation showed appellant discussing with a person known as "yoo_gmo" that Quintana owed him (appellant) money.

During the evidentiary hearing, Perez testified he could not recall if appellant ever acknowledged that his Snapchat username was "waffles_1999" during his interview with detectives.[27] Perez admitted anyone can initiate a Snapchat account under any name. However, based on the photos and videos posted on the account, Perez believed appellant

---

[26] Appellant's present claim only involves the records obtained from Snapchat.

[27] Perez participated in interviewing appellant following his arrest.

31.

had exercised "dominion and control" over this Snapchat account. In addition, appellant's cell phone number appeared on some of the photos posted on this account.

At the conclusion of the testimony, the trial court delayed ruling on the motion in limine. However, it deemed that, throughout the trial, the defense had an ongoing objection to the admissibility of the Snapchat evidence.

At trial, the prosecution called at least three witnesses who discussed appellant's Snapchat account. One witness, I.A., testified he had purchased cocaine from appellant. I.A. was familiar with appellant's shotgun. I.A. testified he had previously seen a picture of appellant's shotgun posted on appellant's Snapchat account, and I.A. identified that photograph in court.

Another witness, S.M., testified he was a good friend of Quintana, and he confirmed Quintana sold drugs. S.M. also knew appellant and he identified appellant in court. S.M. testified he had communicated with appellant on Snapchat, and he had both sold drugs to, and purchased drugs from, appellant. S.M. informed the jury that appellant's Snapchat name was "Waffles_1999." S.M. testified that Quintana's Snapchat name was "Chiefrito."

Finally, Perez informed the jury he had reviewed a Snapchat account under the name "waffles_1999" and he believed it was appellant's account. He had submitted a search warrant to obtain the information from this account. He had received numerous writings from Snapchat in response to his warrant, along with a proof of authenticity from Snapchat. Perez saw pictures and video of appellant from that account, and Perez identified appellant in court. This Snapchat account contained photos depicting cocaine, marijuana and appellant's shotgun. Perez told the jury he found personal information in the text messages from this account that identified appellant as the sender. Perez found a photo of appellant with his Snapchat username on it.

During the trial, the prosecutor reviewed the Snapchat messages with Perez. These messages were admitted into evidence as People's exhibit 117. The Snapchat

messages showed appellant communicating with Quintana (Chiefrito) and with a person known as "yoo_gmo."[28]  These messages showed that Quintana owed a drug debt to appellant; appellant was attempting to recover that money; appellant arranged to meet Quintana for a drug purchase on the night Quintana was killed; and appellant was upset that Quintana owed him money.  Based, in part, on the information obtained from this Snapchat account, Perez opined at trial that appellant was involved in the sales of narcotics and marijuana.

### B.    *Standard of Review*

An abuse of discretion standard is used to review a trial court's ruling on the admission of evidence.  (*People v. Cowan* (2010) 50 Cal.4th 401, 462.)  Under this standard, we will not disturb the trial court's decision on appeal unless the court acted in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; see *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse of discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

### C.    *Analysis*

Appellant argues the trial court erred when it permitted introduction of the messages from his Snapchat account.  According to appellant, these messages were never properly authenticated, and he notes no witness testified from personal knowledge that he posted these messages.  He contends the admission of his Snapchat messages was prejudicial, noting the prosecution relied heavily on them to prove his intent to kill and rob Quintana.  Appellant asserts his case is comparable with *People v. Beckley* (2010) 185 Cal.App.4th 509 (*Beckley*).

---

[28] At trial, Perez testified he did not know the identity of the person using "yoo_gmo" on Snapchat.  Appellant, however, later informed the jury that this was his friend Geronimo.

We disagree that the trial court abused its discretion in permitting introduction of appellant's social media messages. Evidence Code sections 250 and 1401, subdivision (a), require that photographs and writings be authenticated before they are admitted into evidence. Authentication requires "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is .…" (Evid. Code, § 1400.) The author's testimony is not required to authenticate a document and authenticity may be established by circumstantial evidence. (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.) Our Supreme Court holds that any conflicting inferences go to the document's weight as evidence, and not its admissibility. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.) "[W]hat is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible.' " (*Ibid.*) " 'Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented. [Citations.] It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences. [Citation.]' [Citations.]" (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1180, fn. 14.)

Appellant's cited opinion does not assist him. In *Beckley*, two defendants were each convicted of first degree murder and two counts of attempted premeditated murder following a drive-by shooting. Gang and firearm enhancements were found true. (*Beckley, supra,* 185 Cal.App.4th at p. 512.) At trial, the prosecution offered a photograph purportedly showing a witness, a girlfriend of one of the defendants, flashing a gang sign. This evidence was introduced to rebut the witness's testimony she did not associate with a particular gang, and she had pressured her boyfriend to stop his gang association. A detective testified he had downloaded the photograph from the defendant's "MySpace" page on the Internet. The trial court admitted the photograph over both defendants' objections it had not been authenticated. (*Id.* at p. 514.) The appellate court concluded the trial court had erred in admitting the photograph. (*Ibid.*)

34.

In assigning error, the *Beckley* court noted that, although the defendants conceded the witness's face was in the photograph, the record did not contain sufficient evidence to sustain a finding the photograph was an accurate depiction of the witness actually flashing a gang sign. The detective could not testify from his personal knowledge, and no expert testified the picture was not a composite or faked. (*Beckley, supra,* 185 Cal.App.4th at p. 515.) The *Beckley* court expressed concern that digital photographs can be easily altered. (*Ibid.*) The appellate court, however, ultimately determined any error was harmless in light of other evidence introduced against the defendants. (*Id.* at pp. 516–517.)

*Beckley* is distinguishable and it does not warrant reversal of appellant's judgment. Unlike in *Beckley*, which involved the authentication of a photograph that was possibly faked, the present issue involves the authentication of text messages sent through appellant's Snapchat account under the name of "waffles_1999." An inference overwhelmingly exists that appellant was the author of the disputed messages. During his interview with detectives, appellant initially denied that he had ever communicated with Quintana, but appellant eventually admitted to the detectives that he had texted with Quintana on Snapchat. The jury heard from two witnesses, I.A. and S.M., who knew appellant personally and identified him in court. They were both familiar with his Snapchat account. S.M. testified he had communicated with appellant through that account. S.M. confirmed at trial that appellant's Snapchat name was "Waffles_1999." Perez reviewed that account, and found overwhelming evidence that appellant used it to send the messages in question.

Appellant's testimony was not required to authenticate the content from his Snapchat account.[29] (See *People v. Valdez, supra,* 201 Cal.App.4th at p. 1435.) The

_____

[29] During his testimony, appellant admitted to the jury he was "Waffles_1999" on Snapchat. He also admitted sending messages to Quintana and Geronimo from that account.

prosecution made a sufficient prima facie showing that appellant was the author of these writings. Nothing reasonably suggests the messages originating from appellant's Snapchat account were written by someone else or could have been manipulated. Any questions concerning the accuracy and reliability of the content from his account differ dramatically from the questions concerning the accuracy and reliability of the photographic evidence presented in *Beckley*. In permitting introduction of these messages, the trial court did not act in an arbitrary, capricious or patently absurd manner. Thus, an abuse of discretion is not present. Consequently, appellant's arguments are without merit and this claim fails.

## **DISPOSITION**

The judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P.J.


DE SANTOS, J.

36.